**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

| | |
|---|---|
| LAUREN SPURLOCK; HEATHER SMITH; and SHAWN ZMUDZINSKI, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs* <br><br> v. <br><br> WEXFORD HEALTH SOURCES, INCORPORATED, <br><br> *Defendant* | Case No.  3:23-cv-00476 <br><br> **CLASS ACTION COMPLAINT** <br><br> **[JURY TRIAL DEMANDED]** |

## INTRODUCTION

1.     Wexford Health Sources, Inc. ("Wexford") is a for-profit prison health care provider that by policy and practice routinely denies thousands of people critical lifesaving medications prescribed to treat Opioid Use Disorder ("OUD"), in violation of federal and state law, as well as the medical standard of care.

2.     In placing its own profit over people's health and wellbeing, Wexford intentionally subjects patients entrusted to its care to significant pain and suffering and an elevated risk of drug relapse and overdose death.

3.     This complaint seeks vindication on behalf of Plaintiffs Lauren Spurlock, Heather Smith, Shawn Zmudzinksi, and others like them whose OUD needs were ignored and/or whose opioid addiction treatments derailed by Wexford's inhumane policy of denying them this necessary medical care.

4.     OUD is a chronic brain disease that rewires the brain, resulting in uncontrollable cravings for and use of opioids, no matter the negative consequences. Without treatment,

1

individuals with OUD are frequently unable to control their use of opioids, often leading to overdose and death.

5.      Methadone, buprenorphine, and naltrexone (collectively referred to as Medication for Opioid Use Disorder or "MOUD") are the only treatments that have been proven to reduce opioid addiction and symptoms of OUD, improve drug treatment results, and thereby prevent opioid overdose deaths, and lower criminal recidivism rates.

6.      The science is clear; MOUD is necessary to treat OUD and there is no medical justification to categorily deny this treatment to people who would benefit, as Wexford's policy does. MOUD is, according to the American Medical Association, "the standard of care for patients in jail and prison settings."[1]

7.      Communities in which MOUD is accessible are safer and healthier. Ensuring access to MOUD, especially in jails and prisons, also saves communities money, as the cost of MOUD is much lower than the expense of drug-related crimes, prosecutions, and incarceration.

8.      Jails and prisons are the epicenter of the opioid epidemic. Studies show that up to 65% of incarcerated people have a substance use disorder and up to 25% of these inmates suffer from OUD.[2] One study found that incarcerated people are 129 times more likely to die from an overdose in the first two weeks after release compared to the general population.[3]

---

[1] *AMA calls for access to substance use disorder treatment in prisons, jails*, Am. Med. Ass'n (Jun. 15, 2021), https://www.ama-assn.org/press-center/press-releases/ama-calls-access-substance-use-disorder-treatment-prisons-jails

[2] *Opioid Use Disorder: Diagnosis, Evaluation, and Treatment,* Fed. Bureau of Prisons 1 (Aug. 2021), https://www.bop.gov/resources/pdfs/opioid_use_disorder_cg.pdf ("Studies show that up to 65% of incarcerated individuals meet the criteria for a substance use disorder and up to one-quarter of these inmates have OUD").

[3] Ingrid A. Binswanger, et al., Release From Prison — A High Risk of Death for Former Inmates, New England J. of Med. 356, no. 5 (Jan. 2007), https://doi. org/10.1056/nejmsa064115.

9.      Wexford serves as the medical contractor for more than 100 jails and prisons across the country, including West Virginia. In doing so, it assumes the traditional government function of providing healthcare for incarcerated people under color of state law. Wexford is paid handsomely for its medical services, including a $1.4 billion contract to provide healthcare in all Illinois state prisons.

10.      In blatant disregard of this medical standard of care and with indifference to the health and safety of the individuals and communities it serves, Wexford knowingly and intentionally, through its policies and practices, denies MOUD treatment for thousands of people entrusted to its care, even patients being treated with methadone and buprenorphine prior to incarceration.

11.      There is no medical justification to deny MOUD to patients with OUD. But this decision saves Wexford millions of dollars in medical expenses each year. For every ten thousand patients who need MOUD, for example, the company's policy of denying them methadone and buprenorphine saves Wexford approximately $62.4 million per year.[4]

12.      One of these thousands of Wexford patients is Plaintiff Lauren Spurlock, a resident of Huntington, West Virginia. Ms. Spurlock is one of the many unfortunate victims of the opioid

---

[4]  *How much does opioid treatment cost?*, Nat'l Inst. on Drug Abuse (Dec. 2021), https://nida.nih.gov/publications/research-reports/medications-to-treat-opioid-addiction/how-much-does-opioid-treatment-cost:

- methadone treatment, including medication and integrated psychosocial and medical support services (assumes daily visits):  $126.00 per week or $6,552.00 per year
- buprenorphine for a stable patient provided in a certified OTP, including medication and twice-weekly visits: $115.00 per week or $5,980.00 per year
- naltrexone provided in an OTP, including drug, drug administration, and related services: $1,176.50 per month or $14,112.00 per year

epidemic that has ravaged communities across the nation and particularly in Huntington and Cabell County, West Virginia.

13.     On approximately February 7, 2023 Ms. Spurlock was taken into custody and then incarcerated at Western Regional Jail in Barboursville, West Virginia for charges related to possession of opioids.  She remained incarcerated at Western Regional Jail until she was released on or about May 11, 2023.  Wexford has served as the medical contractor for all jails and prisons in West Virginia, including Western Regional Jail, since June 2022.

14.     Ms. Spurlock had previously been diagnosed with OUD and treated with prescribed MOUD. When Ms. Spurlock arrived at the Western Regional Jail, she informed Wexford staff that she had an opioid addiction and needed treatment.  Despite Wexford's knowledge that Ms. Spurlock had OUD and needed MOUD treatment, they failed to provide appropriate care and refused to provide MOUD to Ms. Spurlock.  As a result, Ms. Spurlock experienced terrible withdrawal, in which she felt pain all over her body and had difficulty sleeping, was nauseous, and experienced other physical discomfort.

15.     Plaintiff Heather Smith fell victim to the opioids that were ravaging her community in West Virginia after losing her job a few years ago.

16.     In January 2023, she learned there was a warrant out for her arrest. She thus turned herself in and was then incarcerated in the South Central Regional Jail in West Virginia, bringing her Suboxone and other prescribed medications, which she had successfully been using to treat her OUD since checking herself into rehab a few months before. Wexford has served as the medical contractor for all jails and prisons in West Virginia, including South Central Regional Jail since June 2022.

4

17.     When Ms. Smith arrived at the jail, Wexford verified her prescriptions, including one for MOUD, but nevertheless refused to provide her with her prescribed MOUD. As a result, Ms. Smith experienced terrible withdrawal, in which she felt pain all over her body, her arms and legs jerking to the extent that she could not sleep, sweating, and feeling nauseated. Worst of all, the cravings returned as powerfully as ever—and she knew that there were opioids available in the jail because another woman overdosed during her stay.

18.     Plaintiff Shawn Zmudzinski is another patient who Wexford cruelly denied prescribed medication for OUD while at one of its contracted facilities. Mr. Zmudzinski became addicted to opioids as a teenager in Farmington, New Mexico after his doctor prescribed him opioids for various injuries he suffered as a competitive skateboarder.

19.     In October 2019, Wexford agreed with the New Mexico Department of Corrections to provide all healthcare in state prisons for $246 million over four years.

20.     In November 2021, however, Mr. Zmudzinski was arrested for a technical probation violation for associating with another person with a felony conviction—an individual he was attending sobriety meetings with—and forced to withdraw from his MOUD while incarcerated in San Juan, New Mexico and in Wexford-staffed prisons in Los Lunas, New Mexico and Las Cruces, New Mexico. As a result, Mr. Zmudzinski suffered excruciating pain, including diarrhea, constipation, chills, cold sweats, and he was not able to sleep or eat. He also feared another heart attack, as he had previously had three heart attacks, all during opioid withdrawal. Worst of all, his dreaded opioid cravings returned, and he left the New Mexico prison on December 22, 2021, wanting to use opioids again. Fortunately he was finally was able to resume MOUD treatment, but he is terrified of being forced to go through torturous withdrawal again and the possibility of relapse.

21.     Driven by financial concerns and its indifference to the pain and suffering and elevated risk of relapse, overdose, and death it causes, Wexford categorically bans MOUD to thousands of patient suffering from OUD. Wexford's policy is not grounded in medical science. It is cruel, dangerous, and a direct violation of the medical standard of care. Wexford's conduct in willfully disregarding Plaintiff's and thousands of others' OUD needs violates the Eighth and Fourteenth Amendments of the United States Constitution and constitutes common law negligence.

### PARTIES

22.     Plaintiff Lauren Spurlock is a citizen of the State of West Virginia, the epicenter of the opioid epidemic and which leads the nation in overdose death rates. She is a resident of Huntington, Cabell County, West Virginia, a community that has been ravaged by opioids. She was incarcerated from approximately February 7, 2023 until May 11, 2023 at Western Regional Jail in Barboursville, Cabell County, West Virginia, for which Wexford is the medical contractor.

23.     Plaintiff Heather Smith is a citizen of the State of West Virginia, the epicenter of the opioid epidemic and which leads the nation in overdose death rates. She currently resides in Elkview, Kanawha County, West Virginia. She was incarcerated in January 2023 pre-trial at South Central Regional Jail, for which Wexford is the medical contractor.

24.     Plaintiff Shawn Zmudzinski is a citizen of the State of New Mexico, which has one of the highest opioid overdose death rates in the country, and he currently resides in Farmington, New Mexico. He was incarcerated post-conviction in two prisons in Los Lunas and Las Cruces, New Mexico, for which Wexford was the contractor, in 2020 and 2021.

25.     Defendant Wexford Health Sources, Inc. is a Florida for-profit corporation, maintaining its principal place of business in the Commonwealth of Pennsylvania. Wexford has administered healthcare services, including prescription drugs, to individuals who are incarcerated

pretrial and postconviction at jails and prisons across the United States, including jails and/or prisons in Alabama, Arizona, Illinois, New Hampshire, New Mexico, Pennsylvania, Virginia, and West Virginia.[5]

26.    At all relevant times hereto, Wexford acted under color of state law and pursuant to its own policies and practices when deliberately ignoring the OUD needs and derailing the MOUD treatment of thousands of its patients, all in violation of these patients' and Class Members' rights under the Eighth and Fourteenth Amendments of the United States Constitution and state negligence laws.

### JURISDICTION AND VENUE

27.    This action arises under the United States Constitution, 42 U.S.C. § 1983, and West Virginia and New Mexico common law negligence. The Court has jurisdiction over the federal claims herein pursuant to 28 U.S.C. §§ 1331.

28.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy, and the state law claims do not substantially predominate over the federal claims.

29.    This Court has personal jurisdiction over Wexford because Wexford operates, conducts, and engages in substantial business in this judicial district, including but not limited to contracting for and providing certain services to jails and prisons throughout this State; Wexford committed unconstitutional and tortious acts in this State through its categorical refusal to provide medically necessary treatment in this State for OUD; Wexford caused injury to persons within this

---

[5] As of April 2023, Wexford no longer serves the Alabama Department of Corrections.

State; and a substantial portion of the actions giving rise to Plaintiff's claims took place in this State.

30.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

### A.     **The Opioid Epidemic: The Consequences of Corporate Greed**

31.     The opioid epidemic is killing people in the United States at an unprecedented rate.

32.     In 2017, then-president Donald Trump declared the opioid crisis a nationwide public health emergency because of the surging number of deaths caused by overdose—64,000 in 2016 alone, 65% of which were caused by opioids.[6]

33.     The opioid crisis has only worsened since. Five years later, in 2021, more than 107,000 people in the United States died of a drug overdose. That is a 67% increase from 2016 and a 25% jump from the previous year alone. Of those deaths, 75% involved opioids.

34.     Nationally, one person dies of an opioid overdose every seven minutes. Over 150 people die every day from overdoses related to synthetic opioids like fentanyl.

35.     West Virginia leads the nation in overdose death rates.[7]

---

[6] *HHS Acting Secretary Declares Public Health Emergency to Address National Opioid Crisis*, U.S. Dep't of Health & Human Serv's (Oct. 26, 2017), https://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html [https://public3.pagefreezer.com/browse/HHS.gov/31-12-2020T08:51].

[7] *Drug overdose mortality by state*, Ctrs. for Disease Control and Prevention (last updated Mar. 1, 2022) https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm.

36.     Huntington, West Virginia has been referred to as the overdose capital of America due to an overdose death rate of eight times the national average.[8] Between 2015 and 2018, Cabell County, which includes Huntington, had the highest overdose mortality rate of 125.5 per 100,000 residents in West Virginia.[9]

37.     Private, for-profit companies have been at the forefront of the opioid epidemic. By minimizing and mischaracterizing the risk of chronic opioid use, overstating the benefits of prescription opioid use, and encouraging medical professionals with financial incentives to prescribe chronic opiates at high doses without disclosing the associated risks, these companies flooded the prescription drug market with opiate pills.[10] This ravaged states like West Virginia, where in 2017 West Virginia healthcare providers wrote 81.3 opioid prescriptions for every 100 people, compared to the national rate of 58.7 prescriptions.[11]

38.     Despite manufacturers' and distributors' claims that their pain pills were not addictive, roughly one in four patients who receive prescription opioids long-term will become addicted. According to the Center for Disease Control ("CDC"), within a median of 2.6 years after

---

[8] Sharyn Alfonsi, *Cops bring addition counselor on drug raids to fight opioid crisis*, CBS News (June 6, 2019), https://www.cbsnews.com/news/cops-bring-addiction-counselor-on-drug-raids-to-fight-opioid-crisis/.

[9] *West Virginia Fatal Drug Overdoses*, West Virginia Department of Health and Human Resources at 2 (Jan. 13, 2019), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://dhhr.wv.gov/BBH/DocumentSearch/SEOW/Meeting%20Docs/SEOW%202020/1.13.20%20WV%20Fatal%20Drug%20Overdoses.pdf.

[10] Karen Feldscher & Howard Koh, *What led to the opioid crisis – and how to fix it*, Harvard T.H. Chan. Sch. Of Pub. Health (Feb. 9, 2022), https://www.hsph.harvard.edu/news/features/what-led-to-the-opioid-crisis-and-how-to-fix-it/#:~:text=It%20started%20in%20the%20mid,use%20of%20legal%20prescription%20opioids

[11] *West Virginia Opioid Summary* at 2, Nat'l Ins. of Health (Mar. 2019), https://nida.nih.gov/sites/default/files/21991-west-virginia-opioid-summary.pdf.

the first opioid prescription, one out of every 550 patients on opioid therapy will die from opioid-related causes.[12]

39.     Even for those who do not overdose and die from OUD, the outlook is bleak: it is extremely difficult for patients suffering from OUD to maintain employment, families are often torn apart because of this brain disorder, and people cycle in-and-out of the criminal justice and public health system because of their opioid addiction. The White House Council of Economic Advisers determined that the economic cost of the opioid crisis was $504 billion in 2015, or 2.8 percent of GDP that year.[13]

40.     Numerous lawsuits have been brought across the country in recent years against opioid pharmaceutical manufacturers, distributors, and retailers, for contributing to and profiting from the opioid epidemic. Settlements in these lawsuits will provide much needed and significant financial relief to state and local governments struggling with the damage caused by this corporate greed.

41.     Here too, Plaintiffs bring this lawsuit to ensure that those struggling with OUD are compensated for unconstitutional conduct by private companies, like Wexford, which deny MOUD to thousands of patients suffering from OUD in cruel indifference to their health and safety.

**B.     Opioid Use Disorder is a Life-Threatening Disease That Alters the Brain's Chemistry**

42.     Opioids are a class of drugs that inhibit pain and can cause feelings of pleasure. Some opioids, such as oxycodone, have accepted medical uses, including managing severe or

---

[12] *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, Ctrs. for Disease Control and Prevention (Mar. 18. 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm
[13] *The Underestimated Cost of the Opioid Crisis*, The Council of Econ. Advisers 8 (Nov. 2017), https://trumpwhitehouse.archives.gov/sites/whitehouse.gov/files/images/The%20Underestimated%20Cost%20of%20the%20Opioid%20Crisis.pdf.

chronic pain. Others, such as heroin, are illegal and no longer used as medicine in the United States.

43.     All opioids, including those prescribed for medical use, are highly addictive.

44.     OUD is a chronic, relapsing brain disorder that can have deadly consequences.

45.     OUD symptoms include uncontrollable cravings for and use of opioids, decreased sensitivity to them, and potentially excruciating withdrawal symptoms when they are not taken.

46.     OUD is a progressive brain disease, meaning it often becomes more severe over time.

47.     People who regularly use opioids develop a tolerance and need to use increasing amounts to feel the desired effect. Further, when OUD is untreated, those with the condition are unable to control their opioid intake leading to serious physical and emotional harm. At high doses, opioids depress the respiratory system, sometimes causing the user to stop breathing which can result in death.

48.     OUD breaks down the brain's dopamine system, which is necessary for an individual to feel a sense of normalcy and perform cognitive functions necessary for survival. Dopamine functions as a neurotransmitter and plays a key role in movement, memory, and other body functions.

49.     Brains that are addicted to opioids produce less than half the dopamine of non-addicted brains. People who are dopamine deficient have difficulty experiencing pleasure and being motivated, and often feel depressed and anxious.

50.     OUD rewires the brain for addiction. People with OUD thus cannot simply "will" or "reason" their way out of continued opioid use, even when they are aware of the negative and often dire consequences.

51.     Continued use does not indicate a person lacks willpower, but rather is the predictable result of chemical changes in the brain that result in uncontrollable opioid cravings.

52.     OUD has thus proven especially unresponsive to non-medication-based treatment methods, such as abstinence-only and twelve-step programs, which are popular in treating other addictions such as alcoholism.

53.     Like many other chronic diseases, OUD often involves cycles of relapse and remission.

54.     Rather than a linear progression in which a person attains abstinence from opioid use once and for all, successful recovery from OUD is often characterized by sustained periods of abstinence, known as "active recovery," punctuated by relapses in which the person returns to drug use.

55.     These relapses are frequently triggered by an increase in life stressors, a traumatic event, or, of particular relevance here, a lapse in treatment.

56.     The typical OUD treatment goal is thus to maximize periods of active recovery and minimize periods of relapse. This is best done by ensuring continued treatment and encouraging the use of coping mechanisms and support systems.

C.     **MOUD Allows Millions of Americans who Suffer from OUD to Live Healthy and Productive Lives**

57.     MOUD decreases opioid use, reduces the risk of relapse and overdose death, and improves treatment retention.

58.     MOUD also lowers the likelihood of criminal activity, reduces infectious disease transmissions, and improves patients' ability to maintain positive family relationships and employment.

12

59.     While treatment typically consists of medication combined with counseling and other behavioral therapies, medication is the primary driver of effective OUD treatment.

60.     The U.S. Food and Drug Administration ("FDA") has approved three medications for treating OUD: methadone, buprenorphine, and naltrexone.

61.     Yet, studies show that only two—methadone and buprenorphine—produce longer-term treatment retention, which is the key for recovery. The longer a patient stays in treatment, the less likely they are to relapse.

62.     Methadone and buprenorphine are "agonists," which mean they activate opioid receptors in the brain to relieve withdrawal symptoms and control opioid cravings.

63.     Because methadone and buprenorphine bind to the opioid receptors they stimulate, they block the receptors from being activated by more powerful opiate agonists. This means that patients cannot get "high" from illicit drugs like heroin and fentanyl while on these medications.

64.     This in turn trains a brain rewired from opioid addiction to gradually decrease its response and interest in opioids. This process is known as "extinction learning."

65.     Because of their documented success in treating OUD and reducing related health risks, methadone and buprenorphine are designated as "essential medicines" by the World Health Organization ("WHO").

66.     There is no maximum recommended duration for MOUD treatment. As the Substance Abuse and Mental Health Services Administration ("SAMHSA") recognized, treatment for OUD—like treatment for other chronic diseases such as insulin for diabetes—is often lengthy and can last for years or even be lifelong.

67.     As explained by SAMHSA, MOUD is an "evidence-based treatments option[]" that "relieve[s] the withdrawal symptoms and psychological cravings that cause chemical imbalances in the body."[14]

68.     MOUD allows millions of Americans from diverse backgrounds who suffer from OUD to live healthy and productive lives despite having a disorder that alters their brain chemistry.

### D.     MOUD is the Standard of Care for OUD

69.     A "standard of care" is a medical and legal term that signifies the proper treatment for a certain type of disease or medical condition.

70.     The American Medical Association, the American Society of Addiction Medicine, the U.S. Department of Health and Human Services, the FDA, the National Institute on Drug Abuse, the White House Office of National Drug Control Policy, the SAMHSA, and the WHO have all endorsed the critical role of MOUD, specifically methadone and buprenorphine, in addressing opioid addiction.

71.     The American Medical Association is clear that MOUD is the medical standard of care for OUD and supports the removal of "administrative burdens or barriers that delay or deny care for FDA-approved medications used as part of medication assisted treatment (MAT)[15] for opioid use disorder (OUD)."[16]

---

[14] *Medications, counseling, and Related Conditions – Medications for Substance Abuse Disorders*, Substance Abuse and Mental Health Serv's. admin. (last updated 3/22/2023), https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions.

[15] Medication for Opioid Use Disorder is also referred to as Medication for Addiction Treatment ("MAT").

[16] *AMA Opioid Task Force issues new recommendations to urge policymakers to protect patients' access to evidence-based treatment, remove barriers to comprehensive pain care,* Am. Med. Ass'n 1 (2019), https://end-overdose-epidemic.org/wp-content/uploads/2020/06/2019-AMA-Opioid-Task-Force-Recommendations-FINAL.pdf.

72.     According to the American Society of Addiction of Medicine, "both methadone and buprenorphine maintenance treatments are superior to withdrawal management alone and both significantly reduce illicit opioid use. Further, mortality is lower in patients on methadone or buprenorphine, as compared to those not undergoing treatment. Methadone and buprenorphine also lower the risk of acquiring or spreading HIV infection."[17]

73.     According to the Department of Health and Human Services, "[a]ccess to medications that treat opioid use disorders (known as MOUD) is essential to address the high rates of opioid addiction and overdose mortality."[18]

74.     According to FDA Administrator Commissioner Dr. Robert Califf, "MOUD is a proven intervention to improve outcomes for people with OUD, and recent CDC data indicate that it continues to be vastly underused, particularly in racial and ethnic minority and rural communities."[19]

75.     According to SAMHSA, "just as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is also not sound medical practice to deny people with OUD access to FDA-approved medications for their illness."[20]

---

[17] *The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder,* Am. Soc'y. of Addiction Med. 27 (2020), https://sitefinitystorage.blob.core.windows.net/sitefinity-production-blobs/docs/default-source/guidelines/npg-jam-supplement.pdf?sfvrsn=a00a52c2_2.
[18] *Use of Medications for Opioid Use Disorder (MOUD) in Medicaid*, HHS Office of Inspector Gen., https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000700.asp.
[19] Robert Califf, *FDA's Overdose Prevention Framework Aims to Prevent Drug Overdoses and Reduce Death*, U.S. Food and Drug Admin. (Aug. 8, 2022), https://www.fda.gov/news-events/fda-voices/fdas-overdose-prevention-framework-aims-prevent-drug-overdoses-and-reduce-death.
[20] *Tip 63: Medications for Opioid Use Disorder*, Substance Abuse and Mental Health Serv's. Admin. ES-2 (revised 2021), https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/PEP21-02-01-003.pdf.

76.     According to WHO, methadone and buprenorphine are "essential" medicines that reduce opioid use and overdose and prevent transmission of diseases like HIV and hepatitis.[21]

77.     Recognizing the central role MOUD plays in addressing the opioid crisis and reducing criminal recidivism rates, the first principle of the Biden Administration's 2022 National Drug Control Strategy for criminal justice is expanded MOUD access in jails and prison:[22]

---

**Principle 1: Improve access to MOUD for incarcerated and reentry populations**

Medication for opioid use disorder (MOUD) programs in criminal justice settings, when administered properly by trained professionals, dramatically reduce mortality post-release and increase the likelihood that an individual will stay in treatment, rejoin their communities successfully, and reduce their risk of recidivism—all of which enhance individual and community public health and public safety outcomes.[357,358] Research has shown that for incarcerated individuals with OUD, treatment with MOUD corresponded to a reduction in the risk of death by 85-percent for drug overdoses in the month following their release.[359] We also

98                          **NATIONAL DRUG CONTROL STRATEGY**

---

78.     This is because, according to the 2022 National Drug Control Strategy, ensuring MOUD for all patients with OUD "dramatically reduce[s] mortality post-release and increase[s] the likelihood that an individual will stay in treatment, rejoin[s] their communities successfully, and reduce[s] their risk of recidivism—all of which enhance individual and community public health and public safety outcomes."[23]

---

[21] Greg Herget, *Methadone and buprenorphine added to the WHO list of essential medicines*, HIV/AIDS Policy & Law Review vol. 10.3 (2005), https://pubmed.ncbi.nlm.nih.gov/16544403/.

[22] *National Drug Control Strategy*, The White House, Exec. Office of the President, Office of Nat'l Drug Control Policy (2022), https://www.whitehouse.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf.

[23] *Id.* at 98.

79.    Likewise, President Trump's 2017 Commission on Combating Drug Addiction and the Opioid Crisis called for expanded MOUD access for people with OUD needs in jails and prisons.

80.    This Commission emphasized that providing OUD treatment to those incarcerated is "correlated with reduced risk of mortality in the weeks following release" and "reduce[s] future public safety and public health costs."[24]

81.    Ensuring MOUD access in jails and prisons is also a priority of the U.S. Department of Justice ("DOJ").

82.    In DOJ's 2022-2026 Strategic Plan, the third prong of its "Combat[ing] Drug Trafficking" efforts is making sure (1) that incarcerated people receive the MOUD they need and are entitled to and (2) that the civil rights and constitutional protections of people with OUD are not infringed by improper treatment barriers.[25]

83.    This focus is not new. DOJ has consistently taken the position that MOUD access is required in carceral settings and court programs.

84.    DOJ has repeatedly confirmed that MOUD is the standard of care for treatment of OUD and that denying incarcerated people access to this treatment violates their civil rights and constitutional protections.

85.    For example, in 2017, DOJ's Civil Rights Division launched the Opioid Initiative to work with U.S. Attorney's Offices nationwide "to ensure that people who have completed, or

---

[24]*The President's Commission on Combating Drug Addiction and the Opioid Crisis* 73 (Nov. 1, 2017),
https://trumpwhitehouse.archives.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf.
[25] *FYs 2022-2026 Strategic Plan*, U.S. Dep't. of Justice 33,
https://www.justice.gov/doj/book/file/1516901/download.

are participating in, treatment for OUD do not face unnecessary and discriminatory barriers to recovery."[26]

86.     In 2018, the U.S. Attorney's Office for Massachusetts concluded "that all individuals in treatment for OUD, regardless of whether they are inmates or detainees, are already protected by the ADA, and [] the [Massachusetts Department of Correction] has existing obligations to accommodate this disability."[27]

87.     In January 2021, DOJ's Civil Rights Division issued a report concluding that the Cumberland County Jail in Bridgeton, New Jersey, violated the Eighth and Fourteenth Amendments by failing to provide MOUD to people in its custody, approximately 25% of whom suffered from OUD.[28]

88.     The DOJ concluded that, "because [MOUD] is the standard of care, categorically denying [MOUD] to inmates with Opioid Use Disorder is a failure to provide adequate medical care for this serious medical condition."[29]

89.     The DOJ Report also concluded that the Cumberland County Jail (1) "appreciated and understood the efficacy" of MOUD because it provided this medical treatment "to opioid-addicted pregnant women entering the jail," (2) "acted with deliberate indifference to inmates' serious medical needs by categorically denying [MOUD] to inmates with Opioid Use Disorder,"

---

[26] Charlotte Lanvers & Erin Meehan Richmond, *Opioid Use Disorders and the Americans with Disabilities Act: Eliminating Discriminatory Barriers to Treatment and Recovery Panel at the National Prescription Drug Abuse & Heroin Summit*, U.S. Dep't of Justice 10 (Apr. 4, 2018), https://ncric.org/files/D2DF00000/037.pdf.

[27] Letter from Andrew E. Lelling, United States Attorney for the District of Massachusetts to David Solet and Jesse Caplan (March. 16, 2018), *available at* http://d279m997dpfwgl.cloudfront.net/wp/2018/03/20180322172953624.pdf.

[28] *Investigation of the Cumberland County Jail*, U.S. Dep't of Justice, Civil Rights Division (Jan. 14, 2021) https://www.justice.gov/usao-nj/press-release/file/1354736/download.

[29] *Id.* at 9.

and (3) "acted with deliberate difference to inmates experiencing opiate withdrawal and particularly vulnerable to suicide by failing to provide [MOUD]".[30]

90.     Like the Cumberland County Jail, Wexford enforces a categorical ban on methadone and buprenorphine for prisoners and detainees with OUD who are not pregnant, including by refusing to provide MOUD to patients suffering opiate withdrawal.

91.     Correctional health organizations also recognize MOUD as the standard of care for people with OUD in jails and prisons.

92.     The provision of MOUD in correctional facilities is recommended by many law enforcement organizations including the American Correctional Association, the National Sheriffs' Association, the National Commission on Correctional Health Care ("NCCHC"), the Bureau of Prisons ("BOP"), and the Department of Justice ("DOJ").

93.     According to the American Correctional Association, which creates national standards and accredits prisons across the country, MOUD access "is a priority," "providing MOUD inside correctional facilities has a sizeable impact on overdose deaths, recidivism, and opioid use post incarceration," and offering all forms of MOUD "represents the best practice for OUD treatment persons inside and outside correctional settings."[31]

94.     In 2018, the National Sheriffs' Association and the NCCHC issued guidelines for providing MOUD in correctional facilities, describing this treatment as the "key to halting the

---

[30] *Id.* at 9, 6.
[31] *Expanding Access To Medications For Opioid Use Disorder In Corrections And Community Settings*, Am. Correctional Ass'n., https://www.aca.org/ACA_Member/ACA/ACA_Member/Expanding_Access_to_Medications.aspx.

national epidemic of drug abuse, particularly opioid use disorder" and a proven way "to reduce drug use, overdose, and mortality."[32]

95.     In 2021, the NCCHC published guidelines calling for "universal OUD screening" and the provision of MOUD to those who need this treatment in jails, prisons, and detention facilities. According to the NCCHC, this will "reduce deaths, improve long-term health outcomes, [and] interrupt the cycle of recidivism."[33]

96.     Also in 2021, the Federal Bureau of Prisons issued its "Opioid Use Disorder: Diagnosis, Evaluation, and Treatment Clinical Guidance" which directed its correctional facilities to screen and assess people for OUD "throughout their incarceration" and provide MOUD to those who need it.[34]

97.     According to the Bureau of Prisons, MOUD "reduce[s] drug use, disease rates, and overdose events and increases retention in treatment programs," as well as lowers HIV and hepatitis infections and criminal recidivism rates.[35]

**E.     Providing MOUD in Correctional Facilities Saves Lives and Money**

98.     Incarcerated people face a dramatically elevated risk of relapse, overdose, and death, especially in the weeks immediately following release.

---

[32] [32] *Jail-Based Medication-Assisted Treatment*, Nat'l. Sheriffs' Ass'n. & Nat'l. Comm'n. on Corr. Health Care 3 (Oct. 2018), https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf.

[33] *Opioid Use Disorder Treatment in Correctional Settings*, Nat'l. Comm'n. on Corr. Health Care (Mar. 11, 2021), https://www.ncchc.org/opioid-use-disorder-treatment-in-correctional-settings-2021/.

[34] *Opioid Use Disorder: Diagnosis, Evaluation, and Treatment*, Fed. Bureau of Prisons 6 (Aug. 2021), https://www.bop.gov/resources/pdfs/opioid_use_disorder_cg.pdf.

[35] *Id.* at 2.

99.     A study even found that incarcerated people who are provided with MOUD can decrease their risk for people who are currently incarcerated, provision of MOUD can decrease the risk of death during incarceration by 74%.[36]

100.    Among people who are released from prison or jail (as nearly all incarcerated people are), denial of MOUD increases the risk of death by 250% or more.[37, 38]

101.    Providing MOUD in jails and prisons also saves taxpayer money by reducing criminal recidivism and incarceration rates.[39]

102.    OUD is a common pathway to prison. Between 1980 and 2019, the number of people incarcerated for drug offenses increased more than ten times, from 40,900 to 430,926.[40] About 65% of the prison population in the United States have an active substance use disorder and about 20% were under the influence of drugs or alcohol at the time of their crime.[41]

103.    Because of the nature of OUD, individuals who are not provided consistent drug addiction treatment are likely to continue to have contact with the criminal legal system, including

---

[36] Sarah Larney, et al., *Opioid Substitution Therapy as a Strategy to Reduce Deaths in Prison: Retrospective Cohort Study*, 2014 BMJ OPEN 5  (April 2014), https://bmjopen.bmj.com/content/bmjopen/4/4/e004666.full.pdf; Sarah Wakeman, *Why It's Inappropriate Not to Treat Incarcerated Patients with Opioid Agonist Therapy*, 19(9) AM. MED. ASS'N. J. OF ETHICS, 843-943 (Sept. 2017), https://journalofethics.ama-assn.org/article/why-its-inappropriate-not-treat-incarcerated-patients-opioid-agonist-therapy/2017-09.

[37] Lauren Brinkley-Rubinstein, et al., *The Benefits and Implementation Challenges of the First State-Wide Comprehensive Medication for Addictions Program in a Unified Jail and Prison Setting*, 205 Drug and Alcohol Dependence (Dec. 2019).

[38] John Marsden, et al., *Does Exposure to Opioid Substitution Treatment in Prison Reduce the Risk of Death After Release? A National Prospective Observational Study in England*, Addiction 112, no. 8 (2017): 1408–18, https://www.ncbi.nlm.nih.gov/pubmed/28160345.

[39] *Policy Brief: Effective Treatments for Opioid Addiction*, Nat'l Inst. on Drug Abuse (2016), https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction.

[40] *Trends in U.S. Corrections*, The Sentencing Project 3 (2021), https://www.sentencingproject.org/app/uploads/2022/08/Trends-in-US-Corrections.pdf.

[41] *Criminal Justice DrugFacts*, Nat'l Inst. on Drug Abuse (2020), https://nida.nih.gov/publications/drugfacts/criminal-justice#ref.

multiple stints of incarceration. Conversely, individuals who are provided and maintained on MOUD during their incarceration are more likely to avoid future incarceration.[42, 43]

### F.   Forced Withdrawal or Detoxification is Dangerous

104.    Forcing a person with OUD to withdraw from effective MOUD treatment violates the medical standard of care. Doing so abruptly heightens the risk of acute withdrawal and is even more dangerous.

105.    Once a patient is being treated successfully for OUD through medication, abruptly ending the treatment will often cause excruciating withdrawal symptoms and elevate their risk for relapse, overdose, and death.

106.    These symptoms include severe pain, anxiety, nausea, tremors, vomiting, diarrhea, insomnia, muscle spasms, headaches, delirium, hallucinations, and suicidal ideation.[44] They can start as early as eight hours following withdrawal and can last for months or even years after a complete withdrawal from opioids, depending on how long an individual has used them.[45]

107.    Forced withdrawal is so traumatic for the human body that it can cause pregnant people to miscarry and lead to other life-threatening complications.[46]

---

[42] - *Jail-Based Medication-Assisted Treatment*, Nat'l. Sheriffs' Ass'n. & Nat'l. Comm'n. on Corr. Health Care 5 n.3 (Oct. 2018), https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf (collecting scientific research).

[43] Elizabeth Evans, et al., *Recidivism and mortality after in-jail buprenorphine treatment for opioid use disorder* (2022), https://pubmed.ncbi.nlm.nih.gov/35063323/.

[44] Thomas R. Kosten & Louis E. Baxter, *Review Article: Effective Management of Opioid Withdrawal Symptoms: A Gateway to Opioid Dependence Treatment*, 28 AM. J. ON ADDICTIONS 55 (2019), https://onlinelibrary.wiley.com/doi/full/10.1111/ajad.12862.

[45] Substance Abuse and Mental Health Services Administration, *TIP 63: Medications for Opioid Use Disorder* Substance Abuse and Mental Health Serv's. Admin. 2-12 (2021), https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/PEP21-02-01-002.pdf

[46] *About Opioid Use During Pregnancy*, Ctrs. for Disease Control and Prevention (last updated Nov. 28, 2022), https://www.cdc.gov/pregnancy/opioids/basics.html; *see also* Veronica

108.    Individuals who are forced into withdrawal can also expect the return of intense opioid cravings that were previously curbed by MOUD.

109.    As a result, withholding MOUD from incarcerated people has a broadly destabilizing effect on treatment. Studies have shown that administering MOUD in jail or prison can significantly reduce the likelihood of a return to opioid use or overdose after release.[47]

110.    Both the National Commission on Correctional Health Care and the National Sheriffs' Association have publicly recognized that "forced detoxification of prescribed opioid medication[] such as methadone can undermine an individual's willingness to engage in [MOUD] in the future, compromising the likelihood of long-term recovery."

111.    Another study in the Journal of Substance Abuse Treatment found that forcible removal from methadone during incarceration led to "severe withdrawal," which "contributed to a subsequent aversion to methadone and adversely affected future decisions regarding engagement in [MOUD]."[48]

112.    In contrast to MOUD, forced withdrawal is proven to be ineffective in preventing relapse. For example, a large study of treatment outcomes following forced withdrawal showed that 27% relapsed the day they were discharged, 65% within a month of discharge, and 90% within

---

Spadotto, et al., *Heart Failure Due to "Stress Cardiomyopathy": A Severe Manifestation of the Opioid Withdrawal Syndrome*, 2 ACUTE CARDIOVASCULAR CARE 84 (2013), https://academic.oup.com/ehjacc/article/2/1/84/5921860?login=true.

[47] *Treatment for opioid use disorder in jail reduces risk of return*, Nat'l. Inst. of Health Research Matters (Feb. 8, 2022), https://www.nih.gov/news-events/nih-research-matters/treatment-opioid-use-disorder-jail-reduces-risk-return#:~:text=MOUD%20include%20buprenorphine%2C%20methadone%2C%20and,or%20an%20overdose%20after%20release.

[48] Jeronimo A. Maradiaga, et al., "*I kicked the hard way. I got incarcerated. Withdrawal from methadone during incarceration and subsequent aversion to medication assisted treatments.*" 62 J. OF SUBSTANCE ABUSE TREATMENT 49-52 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4888768/.

a year of discharge.[49] In comparison, individuals treated with methadone or buprenorphine have a success rate of 60-90%.[50]

113.    When treatment must be discontinued, it is crucial to taper methadone and buprenorphine as slowly as possible to avoid severe withdrawal symptoms. This tapering process often lasts several months and sometimes years.

**G.    Pervasive Stigma toward OUD and the Stigma and Cost of MOUD are Barriers to Treating the Disorder**

114.    Despite the broad consensus among medical experts and law enforcement organizations that MOUD is an essential medicine that saves lives, improves drug treatment results, and lowers criminal recidivism rates, entrenched stigma towards OUD generally and MOUD specifically continues to obstruct access to these life-saving medications.

115.    This stigma is grounded in deeply rooted misconceptions that OUD is a choice and a moral failing, rather than a chronic medical condition that permanently rewires the brain and renders it chemically dependent on opioids.

116.    These stereotypes are especially present in the criminal justice system where the erroneous belief that the use of MOUD just substitutes one addiction for another is prevalent.

117.    Research confirms that this stigma is a formidable barrier to patients' access to necessary MOUD treatment.

118.    According to Dr. Nora D. Volkow, Director of the National Institute on Drug Abuse, this stigma "is especially powerful in the context of substance use disorders. Even though medicine

---

[49] Genie L. Bailey, et al., *Perceived relapse risk and desire for medication assisted treatment among persons seeking inpatient opiate detoxification*, 45(3) J. SUBSTANCE ABUSE TREATMENT, 302-05 (2013), https://pubmed.ncbi.nlm.nih.gov/23786852; George E. Valliant, *What does long-term follow-up teach us about relapse and prevention of relapse in addiction?* 83(10) BR. J ADDICTION 1147-57 (1988), https://pubmed.ncbi.nlm.nih.gov/3191263/.
[50] *How Effective is Methadone Treatment?*, Health Care Resource Ctrs. Clinical Team (Jul. 8, 2019), https://www.hcrcenters.com/blog/how-effective-is-methadone-treatment/.

long ago reached the consensus that addiction is a complex brain disorder, those with addiction continue to be blamed for their condition."[51]

119.    Likewise, former FDA Commissioner Dr. Scott Gottlieb emphasized that the push to "expand access to high-quality, effective medication-assisted treatments" to patients with OUD must include "countering the unfortunate stigma that's sometimes associated with their use."[52]

120.    Cost concerns are another systemic barrier to MOUD treatment access.[53]

121.    For example, by choosing to forcibly withdraw all who need MOUD from this critical treatment under the guise of "detoxification," Wexford does not have to purchase these medications for individuals who need them. This saves Wexford approximately $120 per week per person struggling with OUD. That is a cost savings of about $6240 per OUD patient each year.[54]

**H.**    **Wexford Knows its MOUD Treatment Bans Elevate its Patients' Risk of Relapse, Overdose, and Death**

122.    Wexford knows about the devastating and dangerous impact of categorically refusing needed MOUD to its patients and forcing them into withdrawal. Indeed, the company

---

[51]Dr. Nora Volkow, *Addressing the Stigma that Surrounds Addiction*, Nat'l Ins. On Drug Abuse (Apr. 22 2020), https://nida.nih.gov/about-nida/noras-blog/2020/04/addressing-stigma-surrounds-addiction.

[52] *FDA News Release: FDA takes new steps to encourage the development of novel medicines for the treatment of opioid use disorder*, U.S. Food and Drug Admin. (August 6, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm615892.htm.

[53] Sachini Bandara, et al., *Methadone and buprenorphine treatment in United States jails and prisons: lessons from early adopters*, 116(12) ADDICTION 3271-3542 (Dec. 2021), https://doi.org/10.1111/add.15565; *Barriers Limit Access to Medication for Opioid Use Disorder in Philadelphia*, The Pew Charitable Trusts (Mar. 16, 2022, updated Mar. 21, 2022), https://www.pewtrusts.org/en/research-and-analysis/reports/2022/03/barriers-limit-access-to-medication-for-opioid-use-disorder-in-philadelphia.

[54] *See How much does opioid treatment cost?*, Nat'l. Inst. on Drug Abuse (Dec. 2021), https://nida.nih.gov/publications/research-reports/medications-to-treat-opioid-addiction/how-much-does-opioid-treatment-cost.

continues to provide MOUD to pregnant patients receiving OUD treatment prior to incarceration in order to avoid the well-known risk of miscarriage and fetal distress.

123.    But the harmful impact of such withdrawal is just as severe on Wexford's patients who are not pregnant. This includes the post-partum individuals Wexford forces off MOUD after giving birth even though the CDC has warned that "people with OUD during pregnancy should continue MOUD as prescribed in the postpartum period."[55]

124.    In its Medical Guidance for its limited naltrexone program for the Southwest Virginia Regional Jail Authority ("SVRJA"), Wexford warned its medical staff that "[a]fter opioid detoxification, inmate patients are likely to have a reduced tolerance to opioids" and that relapse "could result in potentially life-threatening opioid intoxication."

---

**III.   WARNINGS AND PRECAUTIONS**

    A.   **Vulnerability to Opioid Overdose Following Vivitrol Injection**

        1.   After opioid detoxification, inmate-patients are likely to have a reduced tolerance to opioids.

        2.   Vivitrol blocks the effects of exogenous opioids for approximately 28 days after administration.

        3.   As the blockade wanes and eventually dissipates completely, use of previously tolerated doses of opioids could result in potentially life-threatening opioid intoxication (respiratory compromise or arrest, circulatory collapse, etc.).

*Each state/region may have individual variances, and a copy of those variances should be attached to this guideline.
Rev. 3/4/2022 The Wexford Companies. PROPRIETARY and CONFIDENTIAL                    1

---

125.    In the SVRJA Medical Guidelines, Wexford acknowledges awareness of applicable "recommended best practices, as well as guidelines set forth" by SAMHSA, the FDA, and the American Correctional Association relating to treatment of OUD.

---

Wexford Health's guidance is based on the recommended best practices, as well as guidelines set forth by the pharmaceutical company Alkermes that manufactures Vivitrol, Substance Abuse and Mental Health Administration (SAMSHA) and the Food and Drug Administration (FDA) and the American Correction Association (ACA).

---

[55] *About Opioid Use During Pregnancy*, *supra* n. 46.

126.    But Wexford completely ignores that SAMHSA, the FDA, and the American Correctional Association have publicly called for ensuring patients have MOUD access, which Wexford fails to follow through its policy and practice of categorically denying such necessary medical treatment to non-pregnant patients.

### I.    Wexford Categorically Refuses Medically Necessary OUD Treatment

127.    Driven by corporate greed and entrenched stigma around opioid addiction and MOUD, Wexford, by policy and practice, enforces a categorical ban on methadone and buprenorphine treatment at many of its carceral facilities.

128.    Despite the overwhelming consensus in the medical community that medication is the *only* efficacious treatment for OUD, Wexford's policy and practice is to refuse to provide MOUD to individuals suffering from OUD, including those who enter with a prescription for and are actively being treated with MOUD. Instead of continuing MOUD treatment, Wexford's stated policy is to place those with OUD into forced withdrawal, which has been roundly rejected by the medical community and academic literature as dangerous, cruel, and unproductive.

129.    Wexford's contracts with states and municipalities who delegate the authority to provide medical care for incarcerated persons in their jails and prisons to Wexford. In denying necessary MOUD treatment, Wexford is acting under color of state law and as an instrumentality of the state or municipality with whom it contracts. Wexford therefore takes on the constitutional obligation to provide constitutionally adequate care, which Wexford intentionally, knowingly, and callously violates.

130.    For example, in the New Mexico Department of Corrections, Wexford is obligated to "provide on-site preventive and primary, secondary, and tertiary health care services" that meet

the "prevailing community standards." Its other contracts similarly delegate this fundamental constitutional responsibility from the state or municipality to Wexford.

131.    Wexford, however, fails to provide adequate medical care to thousands of its patients through its categorical ban on MOUD, including Plaintiffs.

132.    Specifically, Wexford maintains a policy manual that is "intended to serve as a reference tool for the proper management of health care services in [all] the jails and prisons served by Wexford."

133.    By policy and practice, Wexford requires that non-pregnant individuals taking "methadone" or other opioids are placed into a "detox protocol" or, in other words, forced into dangerous and painful withdrawal, demonstrating the company's indifference to a brain disorder that millions of Americans struggle with.



| **Wexford Health** SOURCES INCORPORATED | Medical Guidelines Region: Jails |
|---|---|

H.   **Opiate intoxication/withdrawal** (Heroin, codeine morphine, OxyContin, hydromorphone, Methadone, etc.). Symptoms include:   depressed consciousness, miosis, respiratory depression, etc.

   1.   Record amount, route, and duration of habit/use.  Taking into account the possibility of exaggerated dosages.

   2.   Keep patient on bed rest.

   3.   Place on detox protocol after contacting clinician for approval.

   4.   Record on the *Clinical Opioid Withdrawal Scale (COWS)* the presence or absence of signs and symptoms and calculate the severity score of the withdrawal:

   5.   Record vital signs.

   6.   Call clinician immediately for any patient suspected of having a severe narcotic withdrawal by either symptoms or through the COWS assessment.

   7.   DO NOT STOP OPIATES IN PREGNANT FEMALES.

      a.   Obtain a urine drug screen.

      b.   Immediate notification of the responsible provider is needed.

      c.   Methadone induction in a licensed methadone program needs to be arranged ASAP and may in some cases require hospitalization for induction of Methadone or the substitution of prescription narcotics to prevent withdrawal.

   8.   Remember that claims of past substance abuse are often exaggerated.

134.    Likewise, Wexford's description of their "Addiction Recovery Services" on their website (last accessed July 2023) lists the different addiction treatments the company offers, none of which are MOUD (except for patients who are pregnant). Instead, Wexford describes its treatment as "medically supervised detoxification program" which is proven to be in ineffective in preventing opioid relapse and overdoses.

135.    Wexford's cruelty and indifference to Plaintiff's medical needs and those of thousands of other patients suffering from OUD is no accident.

136.    The company's Medical Guidelines instruct its medical staff "that claims of substance abuse are often exaggerated":



137.    By policy and practice, Wexford thus refuses to allow incarcerated people to access MOUD, even when the individual has a valid prescription for MOUD.

138.    Pregnant people who are on MOUD are the only individuals by policy who may be able to continue MOUD in facilities Wexford serves, but even then, Wexford only allows these individuals to be treated during the time that they are pregnant. This is because Wexford is aware of the incredible harm that withdrawal poses to people, including risk of miscarriage. Wexford has plainly calculated that providing MOUD to this temporary, small population is cheaper than paying out lawsuits related to wrongful fetal death. But this policy is not based on the standard of care— which requires *all* individuals who have OUD to have access to MOUD. Nor is it aimed at lessening the pain and risk of withdrawal for pregnant people. To the contrary, Wexford forces these same people to withdraw from MOUD postpartum against the standard of care, causing immense suffering, harm, and risk of overdose and death.

139.    Thus, Wexford's policy to place individuals with OUD into forced withdrawal or to otherwise refuse to provide MOUD is not designed to minimize harm to or risk of relapse of incarcerated people, nor to provide the medically accepted standard of care. Wexford's refusal to provide MOUD to incarcerated individuals is based solely on its own profit motive.

140.    With its bottom line in mind, Wexford disregards its delegated constitutional obligation to provide adequate medical care. Wexford knows that its policy and practice of denying MOUD to tens of thousands of incarcerated individuals causes needless pain and suffering during the withdrawal process and elevates these patients' risk of relapse, overdose death, and recidivism.

### J.    Plaintiffs' Forced Withdrawal from MOUD at a Wexford Facility

141.    Plaintiffs were patients at Wexford facilities, who Wexford—in violation of widely accepted medical standards of care—denied medication to treat their opioid use disorders pursuant to its blanket inhumane policy, thereby subjecting Plaintiffs to the tortious side effects of forced withdrawal and the increased risk of relapse, overdose, death, and/or recidivism when returning to their communities.

#### 1.    Lauren Spurlock

142.    Ms. Spurlock has, like many unfortunate persons across this nation, and particularly in West Virginia, been a victim of the opioid epidemic.

143.    She has battled an opioid addiction for many years and has attempted treatment at various times in her life.  As part of her treatment she has taken part in MOUD treatment at several different times.

144.    In 2012 she was in a local day report center program where she tested positive for opioids.

145.     In 2014 she was diagnosed with an opiate addiction at Prestera Center's Pinecrest addiction treatment campus where she treated for her addiction.

146.     From late 2018 through approximately mid-2019 she treated through PROACT in Huntington, West Virginia where she received MOUD treatment including suboxone.

147.     In 2022 she received MOUD treatment at Harmony Ridge Recovery Center in West Virginia where she also received MOUD treatment including suboxone.

148.     On approximately February 7, 2023 Ms. Spurlock was taken into custody and incarcerated at Western Regional Jail in Barboursville, West Virginia for charges related to opioid possession.  She remained incarcerated at Western Regional Jail until she was released on or about May 11, 2023.  Wexford has served as the medical contractor for all jails and prisons in West Virginia, including Western Regional Jail, since June 2022.

149.     When Ms. Spurlock arrived at the Western Regional Jail, she informed Wexford staff that she had an opioid addiction and needed treatment.  Despite Wexford's knowledge that Ms. Spurlock had OUD and needed MOUD treatment, they failed to provide appropriate care and refused to provide MOUD to Ms. Spurlock As a result, Ms. Spurlock  experienced terrible withdrawal, in which she felt pain all over her body and had difficulty sleeping, was nauseous, and experienced other physical discomfort.

150.     Wexford had contracted to provide all medical care to the prisons and jails in West Virginia as of June 2022. In its contract, it promised to allow patients who were on MOUD to continue their treatment. But unfortunately, Wexford's policy to deny MOUD was the same in Western Regional Jail as it is across the country.

151.     As a result, Ms. Spurlock entered into a terrible withdrawal, in which she experienced pain and extreme discomfort and was denied MOUD.

152.    When she was released from jail approximately four (4) months later, she was able to enter into treatment and recovery.   She now resides in a Sober Living house, maintains employment, and is in recovery receiving appropriate and necessary treatment.

### 2.    Heather Smith

153.    Ms. Smith's life turned upside down when she became addicted to opioids following a car crash that totaled her car and led to the loss of her job, for which a working car was a requirement.

154.    Her opioid addiction quickly became all-consuming. She wanted to be a fully present mother for her children, but her hard-wired cravings were too severe for her to be able to overcome her addiction on her own. She checked into rehab in November 2022 and joined a program at the rehab center that gave her access to MOUD, which worked extremely well at suppressing her cravings and allowed her to remain sober.

155.    However, after leaving rehab, she learned that there was a warrant out for her arrest. As soon as she learned about the warrant in January 2023, she turned herself in, bringing her MOUD and other prescribed medications. She was immediately arrested and detained at South Central Regional Jail in Charleston, West Virginia.

156.    Wexford had contracted to provide all medical care to the prisons and jails in West Virginia as of June 2022. In its contract, it promised to allow patients who were on MOUD to continue their treatment. But unfortunately, Wexford's policy to deny MOUD was the same in South Central Regional Jail as it is across the country. When Ms. Smith arrived at the jail, Wexford verified her prescription, but refused to provide it to her.

157.    As a result, Ms. Smith entered into a terrible withdrawal, in which she experienced pain all over her body, her arms and legs jerking to the extent that she could not sleep, sweating,

and feeling sick. Worst of all, the cravings returned as powerfully as ever—and she knew that there were opioids available in the jail because another woman overdosed during her stay. Exacerbating her agony, she was denied other prescription medications to treat her insomnia and her anxiety, as well as non-prescription baby aspirin needed to prevent a recurrence of cancer.

158.    She was further forced to remain in a "quarantine" (solitary confinement) unit for the first five days of her withdrawal, without access to regular showers or recreation. The isolation and inability to even maintain her own hygiene made every symptom of her withdrawal worse.

159.    Although Ms. Smith made several complaints about her forced withdrawal and desire to access her prescribed MOUD, Wexford ignored those requests, and in some cases the jail did not even provide her with grievance forms to make official requests.

160.    When she was released from the jail on bond nine days later, she was able to retrieve her MOUD and maintain her sobriety. As a result of access to her prescription MOUD, she is able to maintain full-time employment and care for her children. She looks forward to applying to permanent housing for herself and her children, where she can maintain a productive, sober life. But she worries every day that if she is sent back to jail, she will be forced off of her medication yet again. It is only because of the MOUD that she is able to resist the opioid cravings that have been hard-wired into her brain, and so she lives in fear that if she is forced off of her medication again, she could relapse.

### 3.    Shawn Zmudzinski

161.    Mr. Zmudzinski grew up in New Mexico. Mr. Zmudzinski was a competitive skateboarder starting at age 12 and was even sponsored by two skateboarding companies in competitions. Skateboarding is a challenging and dangerous sport, and Mr. Zmudzinski suffered many injuries, including broken bones, leading to his doctor prescribing him opioids many times

starting at age 14. At age 18, Mr. Zmudzinski was prescribed a significant amount of opioids due to a car accident, and after that prescription ran out, he started purchasing opioids from his friends at school, because he suffered pain and cravings when he was not taking them. He then turned to buying opioids on the street where they were freely available.

162.    After initially being arrested for drug possession with intent to distribute marijuana and Percocet in 2009 and 2013, acts he committed to purchase opioids to satisfy his addiction, he was arrested repeatedly for minor technical violations such as missing a check-in with a probation officer or living with someone (his parents) who had alcohol in their home. Every time he went to jail, he was forced to withdraw from his opioids cold turkey—an excruciating experience. Not only did these forced withdrawals cause him tremendous pain and suffering, they put him at risk of relapse and overdose when he returned to the community and had access to prescription opioid pills again.

163.    Indeed, Mr. Zmudzinski nearly died following multiple heart attacks due to opioid withdrawal that had lowered his body's tolerance to the drug. After these heart attacks he decided to turn his life around and got a prescription for MOUD from a doctor. In 2021, however, he was arrested for a technical violation and sent to jail in San Juan, New Mexico, where he was forced into withdrawal from his MOUD. He was still suffering symptoms of active withdrawal when he was transferred to the New Mexico Department of Corrections Los Lunas prison where Wexford was the healthcare provider. He was subsequently transferred to the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico, to serve the remainder of his sentence and where Wexford was also the medical provider.

164.    Wexford providers documented that he had a history of OUD and that he was taking MOUD prior to his arrest.

34

165.     Yet, Wexford did not allow Mr. Zmudzinski to take his prescribed medications. Instead, Wexford forced Mr. Zmudzinski to continue with his withdrawal, without even referring him to a doctor or attempting to provide any medical care to ease his withdrawal, much less MOUD to treat his OUD. Wexford had no medical justification for failing to treat his OUD. He suffered hallucinations, insomnia, lack of appetite, irritability, diarrhea, constipation, chills, cold sweats, and lack of temperature regulation—freezing one moment and burning the next.

166.     Perhaps even worse, he experienced a return of the dreaded cravings for opioids, and based on his previous experience in the prison, he knew that illicit opioids would be available throughout the prison, meaning that he was risking relapse like he had in prison and jail so many times before. Compounding this torture was his fear of having yet another heart attack. He had already had three, all during opioid withdrawal, and he was terrified of having yet another.

167.     This emotional torment resulting from Wexford's failure to treat Mr. Zmudzinski's OUD, unfortunately, is not unique to Mr. Zmudzinski; two of his friends died by suicide during their incarceration in New Mexico after being denied treatment for OUD.

168.     Now that Mr. Zmudzinski has been released, he is again taking MOUD, but he knows that if he is ever arrested again, he will likely be forced to go through torturous withdrawal and is terrified every single day of relapse.

## CLASS ALLEGATIONS

169.     This case is brought individually and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class and subclasses:

> **Class:** All individuals who were confined at a facility for which Wexford was the medical contractor, had a diagnosis of OUD prior to or during incarceration, were denied MOUD pursuant to Wexford's blanket policy or practice; and were released within the applicable statute of limitations.

**New Mexico subclass:** All individuals in the Class who were incarcerated in New Mexico.

**West Virginia subclass**: All individuals in the Class who were incarcerated in West Virginia.

170.   Plaintiffs Lauren Spurlock, Heather Smith and Shawn Zmudzinski represent, and are members of, the Class. Plaintiffs Lauren Spurlock and Heather Smith represent, and are members of, the West Virginia subclass. Plaintiff Shawn Zmudzinski represents and is a member of the New Mexico subclass.

171.   Excluded from the Class is Defendant, and any entities in which Defendant has a controlling interest, the Defendant's employees, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, as well as claims for personal injury or wrongful death.

172.   Plaintiffs reserve the right to amend or modify the Class definitions after having an opportunity to conduct discovery.

173.   The Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff and all members of the Class have been harmed by the acts of the Defendant. Class-wide adjudication of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

174.   **Numerosity. Fed. R. Civ. P 23(a)(1)**. The proposed class is sufficiently numerous that individual joinder of all members is impracticable. Approximately 10,400 individuals are incarcerated at any given time in the West Virginia facilities served by Wexford alone and 7,100 in the New Mexico facilities, with approximately 25% of these individuals likely to have an opioid use disorder. This suggests that thousands of putative class members are subjected to Wexford's MOUD ban every year. Moreover, the exact number of class members can readily be determined

from the internal business records of Defendant, and class members may be notified of the pendency of this action by published and/or mailed/emailed notice.

175.     **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact affect the class members and predominate over individual issues, including, without limitation:

a.     Whether Wexford maintains a policy or custom of denying methadone and buprenorphine to non-pregnant individuals detained in facilities for which Wexford is the medical contractor;

b.     Whether Wexford's policy or custom of denying MOUD to non-pregnant individuals with OUD violates the medical standard of care for OUD treatment;

c.     Whether Wexford is deliberately indifferent to the substantial risk of serious harm to which involuntarily ceasing or refusing to prescribe MOUD exposes Class members;

d.     Whether and to what extent Wexford utilized non-medical considerations with respect to its decisions to discontinue and/or deny MOUD to detainees under its charge;

e.     Whether Wexford owed a duty to Plaintiffs and Class members;

f.     Whether Wexford breached any duties owed to Plaintiff and Class members;

g.     Whether Plaintiffs and Class members are entitled to damages, and the proper measure of their losses.

176.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of those of the Class and are based on the same facts and legal theories as each of the class members. Plaintiffs, like all Class members, were subject to Defendant's uniform policy or custom of denying MOUD treatment to all Class members on grounds that apply equally to all Class members.

177.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Plaintiffs' interests in this action align closely with those of other Class members and are not antagonistic to the interests of any other member of the Class they seek to represent. Their counsel has extensive experience litigating complex matters on a class-wide basis and together, they intend to prosecute the action vigorously.

178.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each Class member are such that individual prosecution would prove burdensome and expensive. Moreover, by definition, many Class members likely continue to struggle with OUD and need to prioritize medical treatment. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. And even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof and the Action presents no difficulties that will impede its management by the Court as a class action.

## COUNT I – Monell Claim
### Violation of the Eighth Amendment
### (on behalf of all Class members)

179.    Plaintiffs Lauren Spurlock, Heather Smith and Shawn Zmudzinski incorporate all preceding paragraphs as if set forth herein.

180.    Defendant Wexford acted under color of state law, carrying out a traditional state function, to deprive Plaintiff and the putative Class of their constitutional rights.

181.    Wexford denied Plaintiffs and Class members MOUD pursuant to a policy or custom.

182.   Wexford violated Plaintiffs' and Class members' right under the Eighth Amendment to be free from deliberate indifference to their serious medical needs.

183.   At all relevant times, Plaintiffs and members of the Class had a serious medical need for medication to treat their OUD.

184.   Notwithstanding that the medical standard of care with respect to treatment of OUD would have been to treat Plaintiffs and Class members with MOUD, Wexford deliberately and unreasonably pursued a policy and practice of dangerous and painful forced withdrawal, pursuant to which it failed to provide Plaintiffs and members of the Class with necessary medication to treat their OUD without any medical justification and contrary to recognized standards of care. Wexford thereby subjected Plaintiff and putative Class members to objectively dangerous conditions that presented substantial risks of serious mental and physical harm.

185.   By denying Plaintiffs and members of the Class access to MOUD, Wexford placed them at heightened risk of opioid cravings and a heightened risk of relapse into active addiction that increased the likelihood of overdose and death.

186.   Wexford's conduct exposing Plaintiffs and members of the Class to such risks violated contemporary standards of decency that mark the progress of a maturing society.

187.   Wexford's policy and custom of denying access to MOUD, which was not motivated by any medical justification or by Plaintiffs' and class members' well-being, subjected them to objectively dangerous conditions that presented substantial risks of serious harm.

188.   As a direct and proximate result of the acts, conduct, and omissions of Wexford, pursuant to established policies, practices, and customs, Plaintiffs and members of the Class suffered injury, including by being denied necessary medical treatment and thereby subject to the associated increased risk of relapse, overdose, recidivism, and death.

**COUNT II – Monell Claim**
**Violation of the Fourteenth Amendment to the United States Constitution**
**(on behalf of all Class members)**

189.     Plaintiffs Lauren Spurlock, Heather Smith and Shawn Zmudzinski incorporate all preceding paragraphs as if set forth herein.

190.     Defendant Wexford acted under color of state law, carrying out a traditional state function, to deprive Plaintiffs and the putative Class of their constitutional rights.

191.     Wexford established, implemented, supplemented, reinforced, promulgated, and/or maintained policies, practices, and customs, as set forth above, all of which were the proximate cause and/or moving force in the violation of Plaintiffs' and Class members' constitutional rights.

192.     Wexford violated Plaintiffs' and Class members' clearly established right under the Fourteenth Amendment to be free from deliberate indifference to their serious medical needs.

193.     At all relevant times, Plaintiffs and members of the Class had a serious medical need for medication to treat their OUD.

194.     Wexford failed to provide Plaintiffs and members of the Class with necessary medication to treat their OUD without any medical justification and contrary to recognized standards of care. Wexford thereby subjected them to objectively dangerous conditions that presented substantial risks of serious mental and physical harm.

195.     By denying Plaintiffs and members of the Class access to MOUD, Wexford placed them at heightened risk of opioid cravings and a heightened risk of relapse into active addiction, potentially resulting in overdose and death.

196.     Wexford's conduct exposing Plaintiffs and members of the class to such risks violated contemporary standards of decency that mark the progress of a maturing society.

197.    Wexford's policy and custom of denying access to MOUD, without regard to Plaintiff and Class members' individualized circumstances, subjected them to objectively dangerous conditions that presented substantial risks of serious harm.

198.    Deliberate indifference is found when a prisoner has an objectively serious medical need, such as OUD, and correctional staff have actual knowledge of, but deliberately disregard, such need.

199.    The acts and omissions of Wexford in failing to provide adequate medical care to Plaintiffs and members of the Class constituted deliberate indifference to their serious medical needs.

200.    As a direct and proximate result of the acts, conduct, and omissions of Wexford, pursuant to established policies, practices, and customs, Plaintiff and members of the Class suffered injury, including by being denied necessary medical treatment and thereby subject to the associated increased risk of relapse, overdose, recidivism, and death.

### COUNT III—Negligence
### (on behalf of all members of the New Mexico Subclass)

201.    Plaintiff Shawn Zmudzinski incorporates all preceding paragraphs as if set forth herein.

202.    Defendant Wexford had a duty to treat prisoners incarcerated in New Mexico state prisons with reasonable care. It was foreseeable that the failure to use reasonable care in providing medical care to New Mexico prisoners would cause injury and damages to those prisoners.

203.    Wexford breached that duty of care by maintaining a policy to deny MOUD to prisoners with OUD, without medical justification.

204.    Wexford's actions were negligent and grossly negligent, meaning its actions constituted reckless, wanton, and willful misconduct.

205.    Wexford's conduct caused direct and identifiable harm to Plaintiff and members of the New Mexico Subclass, including by being denied necessary medical treatment and thereby subject to the associated increased risk of relapse, overdose, recidivism, and death.

206.    Plaintiff and the New Mexico Subclass are entitled to recover compensatory and punitive damages from Wexford.

### COUNT IV—Negligence

### (on behalf of all members of the West Virginia subclass)

207.    Plaintiffs Lauren Spurlock and Heather Smith incorporate all proceeding paragraphs as if fully set forth herein.

208.    Defendant Wexford had a duty to treat prisoners incarcerated in West Virginia state prisons and jails with reasonable care. It was foreseeable that the failure to use reasonable care in providing medical care to West Virginia prisoners and detainees would cause injury and damages to those prisoners.

209.    Wexford breached that duty of care by maintaining a policy to deny MOUD to prisoners with OUD, without regard to Plaintiff and the class members' individualized circumstances, and without medical justification.

210.    Wexford's actions were negligent and grossly negligent, meaning its actions constituted reckless, wanton, and willful misconduct.

211.    Wexford's conduct caused direct and identifiable harm to Plaintiff and members of the West Virginia class, including physical and emotional pain and suffering, increased risk of relapse, overdose, and death, and increased risk of reincarceration.

212.    Plaintiff and the West Virginia class are entitled to recover compensatory and punitive damages from Wexford.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Lauren Spurlock, Heather Smith and Shawn Zmudzinski pray that this Court grant the following relief:

a.      Assume jurisdiction over this action;

b.      Certify this action as a class action on behalf of the putative Class pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiffs as representatives of the Class, and appoint the undersigned as class counsel;

c.      Provide compensatory damages for pain and suffering under the Eighth and Fourteenth Amendments;

d.      Provide punitive damages under the Eighth and Fourteenth Amendments;

e.      Provide compensatory and punitive damages under West Virginia New Mexico and law for negligence and gross negligence;

f.      Award Plaintiffs' costs and reasonable attorneys' fees as allowed by law; and

g.      Award any other relief the Court finds proper.

**TRIAL BY JURY IS DEMANDED**

Dated: July 7, 2023.                          Respectfully submitted,

/s/ W. Jesse Forbes
W. Jesse Forbes, Esq. (WVSB# 9956)
FORBES LAW OFFICES, PLLC
1118 Kanawha Blvd. East
Charleston, WV  25301
Telephone: (304) 343-4050
Facsimile: (304) 343-7450
wjforbes@forbeslawwv.com
*Counsel for Plaintiffs and Proposed Classes*

and

L. Danté diTrapano (W.Va. Bar No. 6778)
CALWELL LUCE DITRAPANO PLLC
Law and Arts Center West
500 Randolph Street
Charleston, West Virginia 25302
Telephone:  (304) 343-4323
Facsimile:  (304) 344-3684
dditrapano@cldlaw.com
*Counsel for Plaintiffs and the Proposed Classes*


Anna C. Haac (*pro hac vice* forthcoming)
Lauren A. Kuhlik (*pro hac vice* forthcoming)
Gemma Seidita (*pro hac vice* forthcoming)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW, Suite 1010
Washington, D.C. 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
ahaac@tzlegal.com
lkuhlik@tzlegal.com
gseidita@tzlegal.com

*Counsel for Plaintiffs and the Proposed Classes*