**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

|  |  |
|---|---|
| LAUREN SPURLOCK, HEATHER SMITH, and SHAWN ZMUDZINSKI, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INCORPORATED,<br><br>       Defendant. | Civil Action No. 3:23-cv-00476<br><br>Hon. Robert C. Chambers<br>Magistrate Judge Joseph K. Reeder |

**PLAINTIFFS' MOTION TO COMPEL INTERROGATORY RESPONSES AND
PRODUCTION OF DOCUMENTS**

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, and Local Rule 37.1(c), Plaintiffs hereby move to compel Wexford to produce complete responses to Plaintiffs' First Set of Interrogatories and Plaintiffs' First and Second Set of Requests for Production.[1]

**I.    INTRODUCTION**

Plaintiffs filed this class action lawsuit on July 7, 2023, alleging that Wexford Health Sources, Inc. ("Wexford"), a for-profit prison health care provider, by policy and practice routinely denies thousands of people critical lifesaving medications prescribed to treat Opioid Use Disorder ("OUD"), in violation of federal and state law, as well as the prevailing medical standard of care.

---

[1] Plaintiffs' First Set of Interrogatories is attached hereto as Exhibit 1.a, with Wexford's Responses and Supplemental Responses thereto attached as Exhibits 1.b-g. Plaintiffs' First Set of Requests for Production is attached hereto as Exhibit 2.a, with Wexford's Responses and Supplemental Responses thereto attached as Exhibits 2.b-h. Plaintiffs' Second Set of Requests for Production is attached hereto as Exhibit 3.a, with Wexford's Responses thereto attached as Exhibit 3.b. For the Court's convenience, a Table of Exhibits accompanies the Exhibits. All citations to Exhibits are abbreviated as "Ex." All emphasis is added and internal quotations omitted unless otherwise noted.

Class Action Complaint, ECF No. 1 ("Complaint" or "Compl."), ¶ 1.

Discovery has largely borne out the allegations in Plaintiffs' Complaint; although Wexford is fully aware of the "extensive evidence supporting the use of medications to treat OUD," Wexford's default policy until recently and its continued practice to this day is to force non-pregnant individuals into painful withdrawal and simply monitor them to ensure they don't die in the process. Wexford knows full well that this harms its patients by increasing their risk of overdose, death, and recidivism. Wexford's Corporate Medical Director has further recognized that "choosing not to treat substance use disorders is not only an ADA violation but has also been confirmed by case law to constitute a violation of the 8th amendment (civil rights)."[2]

The instant motion regards Wexford's refusal to search for and produce documents from key custodians and sources that Plaintiffs uncovered during discovery, including, *inter alia*:

a)    documents relating to complaints and lawsuits involving the same types of claims or injuries alleged in this case, including a spreadsheet Wexford maintains tracking all such lawsuits;

b)    documents from Wexford's officers, who discovery has revealed requested briefing on and likely were central decision makers in Wexford's decisions relating to the treatment of OUD;

c)    documents from the personal email address of Wexford's Corporate Medical Director, who discovery has shown regularly uses his personal email account to conduct official Wexford business;

d)    documents logged by Wexford as privileged, but for which their log description plainly does not support such a claim.

e)    documents supporting Plaintiffs' claim for punitive damages (many of which Wexford has already been required to produce by order of Judge Berger in the Charleston Division of this District in a related case);

---

[2] Ex. 4, Michael A. Mitcheff, *Medications for Opioid Use Disorder (MOUD) programming can and will benefit correctional health care and the greater community*, Wexford Health Sources, Inc., Jun. 21, 2024, *available at* https://www.wexfordhealth.com/medications-for-opioid-use-disorder-moud-programming-can-and-will-benefit-correctional-health-care-and-the-greater-community/.

Given the central nature of these documents to Plaintiffs' claims, Plaintiffs move to compel.

## II.    ARGUMENT

Under Fed. R. Civ. P. 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Thus, "[r]elevance is . . . the foundation for any request for production, regardless of the individual to whom a request is made." *Rose v. Sandy*, 2023 WL 4306909, at *2 (S.D.W. Va. June 30, 2023). "[I]t remains true that 'relevancy in discovery is broader than relevancy for purposes of admissibility at trial.'" *Id*. "[T]he party resisting discovery, not the party seeking discovery, bears the burden of persuasion." *Moore v. Indian Harbor Ins. Co.*, 2023 WL 2520582, at *4 (S.D.W. Va. Mar. 14, 2023); *see also Burd v. Ford Motor Co.*, 2015 WL 4137915, at *6 (S.D.W. Va. July 8, 2015) (party refusing to produce discovery bears the burden of proving that the requested discovery is impermissible.). "As such, conclusory and unsubstantiated allegations are simply insufficient to support discovery objections based on the grounds of annoyance, burdensomeness, oppression, or expense." *Moore,* 2023 WL 2520582, at *4.

For each dispute addressed herein, Wexford has failed to meet its required burden to show the requested discovery is impermissible, instead providing excuses of delay and boilerplate objections. The requested discovery is central to Plaintiffs' claims and those of the putative class, and Plaintiffs are entitled to it under Rule 26(b)(1). Wexford may not delay providing its responses and responsive documents, many of which are relevant to Plaintiffs forthcoming arguments in support of class certification, the motion for which is currently due December 16, 2024.

### A.    Wexford Must Respond Fully to Interrogatory Number 4 and Requests for Production Numbers 37 and 38.

Interrogatory No. 4 requests that Wexford:

Identify every lawsuit filed against You within the past ten years related to treatment of incarcerated individuals with substance use disorder, including denial

3

of MOUD; improper treatment during withdrawal from MOUD or other opioids; and wrongful death or injury related to opioid overdose. For each lawsuit, please state the following:

      a. Case name and number;
      b. Jurisdiction in which the case was filed;
      c. Whether the case is pending or closed;
      d. If the case is closed, a brief description of how the case was resolved (e.g., on a motion for summary judgment, or via settlement);
      e. If the case was tried to verdict, a summary of the verdict including any damages award; and
      f. If the case was settled or resolved through mediation or arbitration, a summary of the resolution including any monetary payment.

Ex. 1.a, Pls' 1st Interrogatories.

Similarly, RFP No. 38[3] requests the case file associated with such lawsuits. RFP No. 37 seeks complaints related to Wexford's treatment or lack thereof of individuals with OUD.[4]

Wexford has refused to fully respond to these requests. With respect to Interrogatory No. 4, although Plaintiffs' counsel has been informed that Wexford maintains a spreadsheet tracking all lawsuits filed against the company (including those involving opioid-related claims), Wexford has refused to produce this spreadsheet or provide the information contained therein. Instead, Wexford reached out ad hoc to its various attorneys to ask them to identify any lawsuits they have litigated on behalf of Wexford. Receiving no response, Wexford's counsel in this litigation simply identified those he was aware of. Wexford's claim that Plaintiffs can or should be required to go through the time-consuming process of looking up the lawsuits and gathering related information

---

[3] Ex. 2.a, Pls' 1st RFPs: RFP 38 seeks: **Legal Claims and Files**. Any and all claims filed in court against Wexford relating to the failure to provide MOUD and the complete case file associated with the same, including any documents produced by either party, any deposition transcripts or other recorded statements taken, any discovery responses, and any court filings.

[4] Ex. 2.a, Pls' 1st RFPs: RFP 37 seeks: **Complaints.** All documents reflecting, constituting, discussing, or otherwise relating to any disciplinary reports, complaints (legal or non-legal), investigations, lawsuits, or other reprimands against Wexford or any Wexford employee, including but not limited to medical providers, related to the treatment of incarcerated individuals with substance use disorder, including the provision, denial, or forced withdrawal of MOUD or other opioids, and wrongful death or injury related to opioids from January 1, 2017 until the present.

that Wexford already tracks and maintains in an easily producible form is not only counter-intuitive, but also not possible given the nature of state court dockets as many are not searchable online. Similarly, with respect to RFP. No. 37, Wexford has provided an unsupported estimate that at least 95% of grievances do not concern MAT or MOUD, but has refused to produce the logs it has for states other than West Virginia.

Plaintiffs' discovery requests seeking lawsuits filed against Wexford and related evidence involving the key issues being litigated in this case are plainly relevant here. Plaintiffs' discovery requests do not seek information and documents relating to *every* lawsuit or complaint Wexford has faced between 2013 and 2023, but only those documents and information involving allegations similar to the case at bar. Such information could well lead to evidence of general patterns of conduct and deliberate indifference by Wexford supporting Plaintiffs' constitutional claims and entitlement to punitive damages. In addition, to the extent Wexford or its employees and experts were taking positions different than those they seek to take in this case, that is relevant for impeachment purposes. Plaintiffs are entitled to know, for example, what Wexford's witnesses and experts testified to in other cases involving the same issues at hand here.

Another West Virginia federal court, faced with the same arguments regarding an interrogatory request related to other cases, granted the plaintiff's motion to compel. *See Pajak v. Under Armour, Inc.*, 2020 WL 265205, at *6 (N.D.W. Va. Jan. 17, 2020). Similarly, *Bibbs v. New River Community & Technical College* required a party to respond to a request setting forth other litigation the party was involved in that raised claims similar those in the case before it, with the court rejecting many of the same arguments Wexford advances here, including overbreadth and public availability. 285 F.R.D. 382, 393–94 (S.D.W. Va. 2012).

**B.      Wexford Must Produce All Documents Concerning Decision-making Related to OUD Treatment from all Sources and Custodians.**

In the course of reviewing Wexford's document productions, Plaintiffs have identified additional individuals who appear to be intimately involved in Wexford's decisions relating to OUD treatment, whose documents Wexford without reason has flatly refused to search. Specifically, Plaintiffs requested the following four Wexford employees be added as custodians:

- Dan Conn – Wexford President and CEO
- Elaine Gedman – Wexford Executive Vice President and Chief Administrative Officer
- John Froehlich – Senior Vice President of Finance & Chief Financial Officer
- Nick Little – Vice President of Strategic Contracting and Compliance

Each are likely to have highly relevant, responsive, and unique documents.

Wexford's internal documents indicate these high-level officials were responsible for much of the decision-making at Wexford with respect to implementation of MOUD policies and programs at the heart of this case. For example, Plaintiffs have learned through discovery that Dan Conn and Elaine Gedman interface with or are part of Wexford's Medical Advisory Committee, a body that discusses and approves changes to Wexford's medical policies, including its withdrawal policy and MAT/MOUD treatment guidelines. *See, e.g.* Ex. 5, WEX00050597. Further, all four individuals were involved in and appear to have specifically requested a key high-level "C-Suite Presentation," during which they were briefed by Wexford's Chief Medical Officer and Corporate Medical Director on the "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" *See* Ex. 6, WEX00093487 at p. 4. Thereafter, Wexford began changing its policies relating to the provision of MOUD and forced withdrawal. Given their central role here, Plaintiffs intend to depose these individuals, but need their documents in order to do so.

Plaintiffs also requested that current custodian and Wexford's Corporate Medical Director,

Dr. Michael Mitcheff's personal Gmail account be searched for responsive documents.[5] Wexford's document productions demonstrate that Dr. Mitcheff—who is centrally involved in the facts of this case—frequently conducts official Wexford business using his personal account, and thus without searching it, Wexford's production is deficient. *See* Ex. 7, WEX00219301 (email from Dr. Mitcheff's Gmail account to Stephen Ritz transmitting a draft of the C-suite MAT presentation where he explains that " ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓").

Notwithstanding Wexford's obligation to meet and confer in good faith over new search terms and custodians under the Parties' ESI Protocol (ECF No. 23 ¶ 4), Wexford has simply refused to comply with its discovery obligations. Wexford did not object on the basis that the custodians were unlikely to have relevant documents—they are—or that the search, review, and production of the requested email accounts would be unduly burdensome—it would not. In fact, Wexford offered no reason whatsoever as to why it was refusing to search for and produce responsive documents from these plainly relevant sources other than that Wexford had already searched for and produced documents. That is insufficient. Indeed, because Wexford used machine learning and predictive coding in its prior document review and production, Wexford should be able to achieve significant efficiencies at this point with respect to any additional review and production.

Plaintiffs have the right to seek discovery regarding *any* nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. Wexford's

---

[5] There are at least 48 documents in Wexford's productions that are either from or to this Gmail account.

current document production demonstrates that these Wexford officers are thoroughly involved in Wexford's OUD and MOUD decision-making, which is of central relevance to the claims in this case. The knowledge and involvement of Wexford's officers is highly relevant to the "deliberate indifference" element of Plaintiffs' constitutional claims, which is established "when a prisoner has an objectively serious medical need, such as OUD, and correctional staff have actual knowledge of, but deliberately disregard, such need." The C-Suite Presentation (Ex. 6) shows that Wexford leadership had actual knowledge of the need for MOUD for those patients suffering from OUD, and Plaintiffs are entitled to learn what Wexford's officers did in response, as well as what knowledge they had prior to this presentation.

### C. Wexford Must Supplement its Privilege Log and Produce Any Erroneously Designated Documents.

Plaintiffs previously requested that Wexford produce certain documents that it withheld as privileged, but for which its own log plainly does not support such a claim. Wexford has not yet done so, nor has it revised or supplemented its log to support its privilege claims, notwithstanding repeated follow-up by Plaintiffs. The following examples illustrate the issues with Wexford's log:

- Entries where attorneys do not appear to be included in the communications as senders or recipients, nor included in the description:
  - WEX_PRIV_00036-WEX_PRIV_00067
  - WEX_PRIV_00087-WEX_PRIV_00090
  - WEX_PRIV_00095
  - WEX_PRIV_00115
  - WEX_PRIV_00129-WEX_PRIV_00130
- Numerous sequential entries where attorneys are referenced in the description, but not included on the thread, nor do any attorneys appear to be included in any thread version:
  - WEX_PRIV_00096- WEX_PRIV_113
- Entries where attorneys are referenced in the description, but not included on the thread:
  - WEX_PRIV_00143
  - WEX_PRIV_00148
  - WEX_PRIV_00182- WEX_PRIV_183
  - WEX_PRIV_00212- WEX_PRIV_222
  - WEX_PRIV_00224-WEX_PRIV_226
- Entries where the description does not appear to match the document type, making it

8

impossible to assess the claim of privilege:
- o WEX_PRIV_00157
- o WEX_PRIV_00170

The party asserting the attorney-client privilege bears the burden of showing that it applies. *Burk v. C.B. Fleet Co., Inc.*, 2008 WL 11380083, at *2 (S.D.W. Va. Dec. 3, 2008) (collecting cases). Wexford has not met its burden. For example, numerous documents listed above are being withheld as protected attorney-client communications but do not include any attorneys. "Under the general West Virginia standard of attorney-client privilege, the first requirement is that the communication must be between a client and an attorney." *Id.* at *2.

**D.      Wexford Must Respond to Financial Discovery Aimed at Punitive Damages.**

RFP Nos. 63-64 and 66-75 are all intended to obtain information regarding Wexford's finances. Wexford objected to these Requests as going to punitive damages and argued that Plaintiffs had not yet made a prima facie showing of entitlement to such damages. *See* Ex. 3.b, Wexford's Response to Plaintiffs' Second Set of RFPs, ECF No. 78. But these same arguments were rejected by another court in a similar case in this District, which required Wexford to produce most if not all of the financial information Plaintiffs seek here. *See Taylor v. Wexford Health Sources, Inc.*, No. 2:23-CV-00475, 2024 WL 1495781, at *2-3 (S.D.W. Va. Apr. 5, 2024). During the Parties' various meet and confers on this issue, Plaintiffs asked if Wexford would agree at a minimum to reproduce those documents it had already produced in *Taylor*, but Wexford refused.

**1.      Another court in this District rejected the same arguments Wexford makes here, ordering production of the discovery Plaintiffs seek.**

Punitive damages *are* at issue in this case. As discussed below, Wexford's argument that it should not be required to produce financial information until Plaintiffs make a prima facie showing, and that such a claim is better made on fully developed motions for summary judgment was specifically rejected by the magistrate, and the district court agreed, in *Taylor*. Moreover,

9

Plaintiffs' motion for class certification is due this December, meaning that time is of the essence given that one of the common issues in this case supporting class certification is whether Plaintiffs are entitled to punitive damages.

In the *Taylor* case, the plaintiff brought claims similar to those brought here against Wexford, albeit in an individual capacity, and Wexford pointed to the same cases it cited here in response to Plaintiffs' RFPs. *Id.* at *3. But as the *Taylor* plaintiff pointed out, the standard for punitive damages for the federal claims at issue in that case (which are the same as those at issue in this action) requires only a showing by a preponderance of the evidence that the defendant's conduct was "motivated by evil motive or intent, or . . . involves reckless or callous indifference to the federally protected rights of others." *Id.* (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983). Moreover, as the Fourth Circuit has explained, "[t]he callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987).

And there is already plenty of evidence that would support both a finding of deliberate indifference and punitive damages here, just as there was in *Taylor*, which allowed similar claims against Wexford by an individual plaintiff to proceed to trial, and just as there was in *Baxley v. Jividan*, in which this Court allowed class claims of deliberate indifference to proceed to trial involving the provision of medical care by Wexford and another West Virginia private prison medical contractor. 508 F. Supp. 3d 28 (S.D.W. Va. 2020).

In *Taylor*, the plaintiff pointed to, *inter alia*, an expert report and documents from Wexford showing that Wexford has a practice of denying MOUD to patients notwithstanding its own knowledge that forcing patients into withdrawal is contrary to the medical standard of care, causes unnecessary pain and suffering, and increases patients' risk of overdose, death, and recidivism.

10

2024 WL 1495781 at *3. The *Taylor* plaintiff also argued that Wexford had not shown it would be prejudiced in any way by producing the requested discovery. *Id.* The same is true here. Even more so given that Wexford has already had to produce much if not all of the requested discovery by virtue of the order in *Taylor*. And the same evidence in that case, which was re-produced here, similarly supports production, just as the magistrate and district court held.

Nor it this the first time this Court has had to adjudicate issues relating to "systemwide deficiencies in the provision of medical and mental health care" by Wexford, which subjected prisoners "to substantial risk of harm" sufficient to "provide the basis for a finding of deliberate indifference." *Baxley*, 508 F. Supp. 3d 28. Just a few years ago, this Court granted class certification to a group of affected prisoners and denied the State of West Virginia summary judgment in *Baxley v. Jividan*, which necessarily required the plaintiffs to show that the policies and practices implemented by Wexford and West Virginia's other private prison medical contractor, PrimeCare (both of whom were not defendants in that case), provided inadequate medical care such that the State of West Virginia could be held liable for those policies by virtue of having abdicated their oversight role and duty to ensure adequate medical care was being provided. *See* 338 F.R.D. at 87 (S.D.W. Va. 2020); 508 F. Supp. 3d 28 (S.D.W. Va. 2020).

The court in *Taylor* similarly ruled against Wexford on summary judgment, holding that a jury could find Wexford acted with deliberate indifference in the care of a patient with OUD given the record evidence "that OUD presents substantial risk of harm," that Wexford's Guidelines and its medical director "recognized that failure to provide MOUD can lead to negative outcomes, including withdrawal and much higher risk of relapse and overdose death," and that Wexford had "a policy to deny MOUD." No. 2:23-cv-00475 (ECF No. 254). The *Taylor* court also excluded Wexford's expert for advancing subjective beliefs ungrounded in medical science. *Id*. at ECF No.

11

239.

In addition to the evidence produced and relied upon in *Baxley* and *Taylor*, Plaintiffs offer the following from the evidentiary record in this case, which together more than demonstrates a prima facie claim for punitive damages.

> **2.      The medical standard of care for treating OUD with MOUD has been well-established for many years, as Wexford knows.**

Wexford has long known that the medical standard of care is to treat OUD with medication. In 2017, the Department of Justice (DOJ) identified individuals with OUD as protected under the Americans with Disabilities Act (ADA), while recognizing MOUD as being critical to treating this disability.[6] Statements from the American Medical Association (AMA), the American Society of Addiction Medicine (ASAM), the Food and Drug Administration (FDA), and the Substance Abuse and Mental Health Services Administration (SAMHSA) have reflected the same.[7] Nor is there anything about the correctional setting that changes this standard of care. In 2021, the DOJ faulted Cumberland County Jail for "act[ing] with deliberate indifference to inmates' serious medical needs by categorically denying [MOUD] to inmates with Opioid Use Disorder," pointing out that

---

[6] Charlotte Lanvers & Erin Meehan Richmond, *Opioid Use Disorders and the Americans with Disabilities Act: Eliminating Discriminatory Barriers to Treatment and Recovery Panel at the National Prescription Drug Abuse & Heroin Summit*, U.S. Dep't of Justice, *available at*: https://ncric.org/files/D2DF00000/037.pdf.

[7] *See AMA Opioid Task Force issues new recommendations to urge policymakers to protect patients' access to evidence-based treatment, remove barriers to comprehensive pain care,* Am. Med. Ass'n 1 (2019), *available at* https://end-overdose-epidemic.org/wp-content/uploads/2020/06/2019-AMA-Opioid-Task-Force-Recommendations-FINAL.pdf; *The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder,* Am. Soc'y. of Addiction Med. 27 (2020), *available at* https://sitefinitystorage.blob.core.windows.net/sitefinity-production-blobs/docs/default-source/guidelines/npg-jam-supplement.pdf?sfvrsn=a00a52c2_2; Robert Califf, *FDA's Overdose Prevention Framework Aims to Prevent Drug Overdoses and Reduce Death*, U.S. Food and Drug Admin., Aug. 8, 2022, *available at* https://www.fda.gov/news-events/fda-voices/fdas-overdose-prevention-framework-aims-prevent-drug-overdoses-and-reduce-death; *Tip 63: Medications for Opioid Use Disorder*, Substance Abuse and Mental Health Serv's. Admin. ES-2 (revised 2021), *available at* https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf.

12

the Jail's provision of MOUD to pregnant people (just as Wexford's policy here) showed that the County recognized and understood the efficacy of MOUD, which further supported its deliberate indifference in failing to provide it to non-pregnant inmates.[8]

ASAM guidance from 2020 likewise states that "[a]ccess to evidence-based OUD treatment including all FDA-approved medications, either on site or through transport, is the standard of care for all detained or incarcerated persons."[9] The Federal Bureau of Prisons in 2021 confirmed the same.[10] As did the National Commission on Correctional Healthcare, which released a position statement titled Opioid Use Disorder Treatment in Correctional Settings.[11]

In line with the medical consensus, a C-Suite Presentation by Wexford's Chief Medical Officer and Corporate Medical Director, Dr. Michael A. Mitcheff, could not be clearer in recognizing that ███████████████████████████████████████████████████████ ███████ " Ex. 6 at p. 51. Dr. Mitcheff has also authored articles and made numerous presentations recognizing "the extensive evidence supporting the use of medications to treat OUD" and incorporating the data and science reflected in this C-Suite Presentation.[12]

---

[8] *Investigation of the Cumberland County Jail*, U.S. Dep't of Justice, Civil Rights Division, Jan. 14, 2021, *available at* https://www.justice.gov/usao-nj/press-release/file/1354736/download.

[9] *Public Policy Statement on Treatment of Opioid Use Disorder in Correctional Settings*, Am. Soc'y of Addiction Med., Jul. 15, 2021, *available at*: https://www.asam.org/docs/default-source/public-policy-statements/2020-statement-on-treatment-of-oud-in-correctional-settings.pdf.

[10] *Opioid Use Disorder: Diagnosis, Evaluation, and Treatment*, Federal Bureau of Prisons, Aug. 2021, *available at* https://www.bop.gov/resources/pdfs/opioid_use_disorder_cg.pdf ("[U]se of combined behavioral therapy and medications for OUD is the generally accepted standard of care.").

[11] *See* https://www.ncchc.org/position-statements/opioid-use-disorder-treatment-in-correctional-settings-2021/ for full statement.

[12] *Webinar Description: Treating Opioid Use Disorder: A Review of FDA-Approved Medications and Buprenorphine Prescribing Requirements*, Michael A. Mitcheff, Feb. 9, 2023, *available at* https://www.ismanet.org/ISMA/Events/Event_Display.aspx?EventKey=LWEB020923; *see also* Ex. 8, Presentation for Project ECHO at Indiana University: *Overview of opioid use disorder with Focus on Buprenorphine[,] Suboxone vs Sublocade*, Michael A. Mitcheff, July 20, 2022, *available*

13

### 3. Despite Wexford's knowledge that MOUD is the standard of care, Wexford forced patients into painful and life-threatening withdrawal.

Since OUD is a brain disease, it is especially unresponsive to non-medication-based treatment methods. If a person stops opioids suddenly or without the proper medication, the resulting withdrawal can and sometimes does kill. Accordingly, it is critical to continue MOUD for those already on medication. For others who present evidence of OUD, MOUD should be used to prevent the inhumane physical—and sometimes deadly—withdrawal symptoms as opioids leave a patient's system and to treat the chronic brain disorder, which improve outcomes and prevents overdose death and relapse.

Even if a patient with OUD manages to survive the initial agonizing and dangerous withdrawal, they are still at greater risk of death from this chronic condition. In fact, not treating OUD while someone is incarcerated raises the risk of overdose death to 50 times that of the general public within the first two weeks after release.[13] It is thus well-established that it is inhumane and potentially deadly to force patients to withdraw from opioids or interrupt their MOUD treatment.

Yet, that is exactly what Wexford did. Wexford's default policy and practice has long been to force them into painful withdrawal and simply monitor them to ensure they don't die in the process—what Wexford referred to as "detox" and later recoined as "medically supervised withdrawal." *See, e.g.*, Ex. 9, Neil Fischer, Presentation: *DETOX Update & Pregnant Patients*, April 13, 2022 (WEX00050329). This plainly violates the long-established medical standard of

---

*at*
https://oudecho.iu.edu/resources/downloads/Subclade%20vs%20Sublingual%20Michael%20Mit cheff%207.20.22.pdf ("Project ECHO Presentation").

[13] Shabbar I. Ranapurwala, et al., *Opioid Overdose Deaths Among Formerly Incarcerated Persons and the General Population: North Carolina, 2000–2018*, Am. J. of Public Health 112, no. 2 at pp. 300-303 (February 1, 2022), *available at*: https://doi.org/10.2105/AJPH.2021.306621. Other studies have also consistently found higher rates of overdose mortality immediately after release from incarceration.

care for treating OUD. As repeatedly recognized by Wexford and its medical director, Dr. Mitcheff: "Detox is not treatment." *See, e.g.*, Ex. 8 at p. 19.

Prior to late 2022, Wexford's opioid policies could be found in its global and regional "Medical Guidelines," which acknowledged that withdrawal from opiates is a "life-threatening situation." Ex. 10, Excerpts of Medical Guidelines, Wexford Health Sources, Inc., Rev. Feb. 1, 2021 (obtained via FOIA request) at p. 14. Yet, despite recognizing that forced withdrawal is so traumatic to the human body that it can be deadly, Wexford's policy for non-pregnant individuals was to simply let them suffer and make sure they didn't die on Wexford's watch. Wexford's opioid policy for pregnant patients was different. Although withdrawal without the use of MOUD causes severe physical pain and potentially death whether a patient is pregnant or not, Wexford provided MOUD to pregnant patients as a matter of policy due to the risks to the developing fetus.

Sample text from Wexford's Medical Guidelines shows the company's opioid protocols for both pregnant inmates and inmates who are not pregnant:

H. **Opiate intoxication/withdrawal** (Heroin, codeine morphine, OxyContin, hydromorphone, Methadone, etc.). Symptoms include: depressed consciousness, miosis, respiratory depression, etc.

1. Record amount, route, and duration of habit/use. Taking into account the possibility of exaggerated dosages.
2. Keep patient on bed rest.
3. Place on detox protocol after contacting clinician for approval.
4. Record on the *Clinical Opioid Withdrawal Scale (COWS)* the presence or absence of signs and symptoms and calculate the severity score of the withdrawal:
5. Record vital signs.
6. Call clinician immediately for any patient suspected of having a severe narcotic withdrawal by either symptoms or through the COWS assessment.
7. DO NOT STOP OPIATES IN PREGNANT FEMALES.
   a. Obtain a urine drug screen.
   b. Immediate notification of the responsible provider is needed.
   c. Methadone induction in a licensed methadone program needs to be arranged ASAP and may in some cases require hospitalization for induction of Methadone or the substitution of prescription narcotics to prevent withdrawal.
8. Remember that claims of past substance abuse are often exaggerated.

Ex. 10 at p. 18. As set forth in the above, non-pregnant patients with evidence of opiate use were not provided MOUD, but instead were placed on a "detox protocol," where they were forced into

withdrawal and observed in a segregated area. *See generally* Ex. 9. The presence and severity of withdrawal symptoms were then recorded in what is known as the Clinical Opiate Withdrawal Scale ("COWS"). In short, Wexford put patients into withdrawal and watched to see if they got close to death, while simply recording the horrific agonizing symptoms they experienced.



*See* Ex. 11, Excerpts of *Wexford Companies Global Addiction Medicine Guidelines*, Rev. Jan. 3, 2024, (WEX00000001 at WEX00000056).



. Said another way, ████████████ —which gave rise to this lawsuit and is still Wexford's practice in most of its facilities for most of its patients—was not medically appropriate to treat OUD and caused high rates of overdose and death (in addition to the horrific and painful withdrawal symptoms patients like Plaintiffs suffered).

Yet, ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████.

Indeed, Wexford's Chief Medical Officer and Corporate Medical Director advised

████████████████████████████████

████████████:

> After reviewing the American with Disabilities Act (ADA), DOJ guidelines and investigations, reported case law, legislative initiatives and relevant articles, we strongly recommend that every jail implement policies that apply to both inmates and pre-trial detainees, to include screening and identification of inmates, including those currently in MAT programs and those with OUD who will experience withdrawal. MAT/MOUD should be continued for those already in treatment, and offered to those identified as having OUD."

*See* Ex. 6 at 4; Ex. 12, Wexford Mem. re: *ADA Guidelines – MAT/MOUD* (WEX00081927). And yet to this day, Wexford's practice in the vast majority of facilities in which it operates continues to be to force patients into painful withdrawal in contravention of all medical standards of care.

### 4. Wexford knowingly caused harm with its forced withdrawal.

Those subjected to Wexford's historic policy and continued practice of denying medically appropriate treatment for OUD have experienced significant harm as a result of Wexford's conduct. In addition to the agonizing physical and emotional pain and suffering that unmedicated withdrawal causes, withholding MOUD from incarcerated people has a broadly destabilizing

effect on treatment and significantly increases the likelihood of overdose, death, and recidivism, contributing to the opioid crisis.

Studies have shown that administering MOUD in jail or prison can significantly reduce the likelihood of a return to opioid use or overdose after release. Indeed, an article authored by Dr. Mitcheff on Wexford's own website explains:

> Among incarcerated patients with an opioid use disorder, there is an 87% increase in overall mortality for individuals not on MOUD compared to those who are receiving MOUD. Data also shows that MOUD treatment corresponded with a 75% reduction in overdose deaths during justice-involved patients' first few weeks of release from incarceration.

Ex. 4 at p. 3. ███████████████████████████████████████████████████

███████████████████████████████████████████████████



Ex. 6 at p. 16.

For those who manage to survive the agonizing symptoms of forced withdrawal and increased risk of overdose and death that follows release without proper treatment, the outlook is still bleak where there is an absence of proper treatment prior to release. As recognized in 2018 by both the National Commission on Correctional Health Care and the National Sheriffs' Association, "forced detoxification of prescribed opioid medication[] such as methadone can undermine an individual's willingness to engage in [MOUD] in the future, compromising the likelihood of long-

18

term recovery."[14]



Ex. 6 at p. 31. It is thus no surprise that a failure to treat OUD with MOUD in a correctional setting increases the odds of a patient's recidivism.[15] All of which means that Wexford's failure to provide appropriate medical care to those with OUD contributes to the opioid crisis and the economic cost that is born by patients, their families, and society at large.

Plaintiffs all suffered due to Wexford's policies. For example, when Plaintiff Spurlock arrived at the Western Regional Jail, she informed Wexford staff that she had an opioid addiction and needed treatment, but Wexford refused to provide her with MOUD, causing her to experience terrible withdrawal, in which she felt pain all over her body and had difficulty sleeping, was nauseous, and experienced other physical discomfort. ECF No. 1, Complaint, ¶ 149. Plaintiff Smith learned that she had an outstanding arrest warrant in January 2023 and turned herself in, bringing with her MOUD and other prescribed medications. Wexford verified her prescription, but refused

---

[14]    *Jail-Based    Medication-Assisted    Treatment*    (Oct.    2018),    *available    at* https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf, at 23.
[15] *National Drug Control Strategy*, The White House, Exec. Office of the President, Office of Nat'l Drug    Control    Policy    (2022),    *available    at*:    https://www.whitehouse.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf.

to provide MOUD to her, also causing her to enter a terrible withdrawal, in which she experienced pain all over her body, her arms and legs jerking to the extent that she could not sleep, sweating, and feeling sick. *Id.* at ¶ 156-58. Plaintiff Zmudzinski was arrested for a technical violation and was still suffering symptoms of active withdrawal when he was transferred to Wexford's care. *Id.* at ¶ 163. Wexford providers documented that he had a history of OUD and was taking MOUD, Wexford denied him his prescription, causing him to suffer hallucinations, insomnia, lack of appetite, irritability, diarrhea, constipation, chills, and cold sweats. *Id.* at ¶ 164-65.

All of this cruel treatment and suffering experienced by Plaintiffs was the result of Wexford failing to enact MOUD guidelines and policies that met the nationwide standard of care. Discovery into Wexford's financial conditions related to potential damages for these injuries is therefore relevant, and Wexford has no reason to withhold such discovery.

## III.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court enter an order granting their Motion to Compel in full.

Dated: October 9, 2024                Respectfully submitted,

/s/ David H. Carriger, Esq.
L. Dante diTrapano (WV Bar #6778)
David H. Carriger (WV Bar #7140)
Calwell Luce di Trapano PLLC
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
T: (304) 343-4323
F: (304) 344-3684
dditrapano@cldlaw.com
dcarriger@cldlaw.com

W. Jesse Forbes (WV Bar #9956)
Jennifer N. Taylor (WV Bar #4612)
Forbes Law Offices, PLLC
1118 Kanawha Boulevard, East

Charleston, WV 25301
T: (304) 343-4050
F: (304) 343-7450
wjforbes@forbeslawwv.com
jtaylor@forbeslawwv.com

Anna C. Haac (*pro hac vice*)
Gemma Seidita (*pro hac vice*)
Tycko & Zavareei LLP
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
T: (202) 973-0900
F: (202) 973-0950
ahaac@tzlegal.com
gseidita@tzlegal.com

Julie S. Selesnick (*pro hac vice*)
Natalie Lesser (*pro hac vice*)
Berger Montague PC
2001 Pennsylvania Avenue, NW, Suite 300,
Washington, DC 20006
T: (202) 221-5279
F: (800) 424-6690
jselesnick@bm.net
nlesser@bm.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

LAUREN SPURLOCK; HEATHER
SMITH; and SHAWN ZMUDZINSKI,
individually and on behalf of all others
similarly situated,

          Plaintiffs,

      v.

WEXFORD HEALTH SOURCES
INCORPORATED,

          Defendant.

Civil Action No. 3:23-cv-00476
Honorable Robert C. Chambers
Magistrate Judge Joseph K. Reeder

October 9, 2024

**CERTIFICATE OF SERVICE**

    I, David H. Carriger, hereby certify that on October 9, 2024, a true and correct copy of

*Plaintiff's Motion to Compel Interrogatory Responses and Production of Documents* provided via

electronic mail to the following:

Jordan K. Herrick, Esq.
Harrison M. Cyrus, Esq.
Bailey & Wyant, PLLC
500 Virginia Street East, Suite 600
P.O. Box 3710
Charleston, WV 25337
jherrick@baileywyant.com
hcyrus@baileywyant.com

Michael J. Bentley, Esq.
Bradley Arant Boult Cummings LLP
188 E. Capitol Street, Suite 1000
Jackson, MS 39201
mbentley@bradley.com
*Counsel for Wexford Health Sources Incorporated*

/s/David H. Carriger, Esq.
L. Danté diTrapano (W. Va. Bar No. 6778)
David H. Carriger (W. Va. Bar No. 7140)
**CALWELL LUCE DITRAPANO PLLC**

**TABLE OF EXHIBITS**

| No. | Exhibit |
|---|---|
| 1 | Compilation Exhibit of Plaintiffs' First Set of Interrogatories and Defendant Wexford's Responses and Supplemental Responses:<br>1.a – Plaintiffs' 1st Interrogatories, dated Dec, 8, 2023<br>1.b – Wexford's Initial Responses and Objections (sans Interrogatory No. 3), dated Mar. 28, 2024<br>1.c – Wexford's Initial Response and Objections to Interrogatory 3, dated Apr. 8, 2023<br>1.d – Wexford's 1st Supplemental Responses and Objections, dated Apr. 10, 2024<br>1.e – Wexford's 2nd Supplemental Responses and Objections, dated Apr. 18, 2024<br>1.f – Wexford's 3rd Supplemental Responses and Objections, dated Apr. 29, 2024<br>1.g – Wexford's 4th Supplemental Responses and Objections, dated May 6, 2024<br>1.h – Wexford's 5th Supplemental Responses and Objections, dated May 7, 2024 |
| 2 | Compilation Exhibit of Plaintiffs' First Set of Requests for Production and Defendant Wexford's Responses and Supplemental Responses:<br>2.a – Plaintiffs' 1st RFPs, dated Dec, 8, 2023<br>2.b – Wexford's Initial Responses and Objections, dated Mar. 18, 2024<br>2.c – Wexford's 1st Supplemental Responses and Objections, dated Mar. 20, 2024<br>2.d – Wexford's 2nd Supplemental Responses and Objections, dated Mar. 27, 2024<br>2.e – Wexford's 3rd Supplemental Responses and Objections, dated Apr. 8, 2024<br>2.f – Wexford's 4th Supplemental Responses and Objections, dated Apr. 10, 2024<br>2.g – Wexford's 5th Supplemental Responses and Objections, dated Apr. 18, 2024 |
| 3 | Compilation Exhibit of Plaintiffs' Second Set of Requests for Production and Defendant Wexford's Responses<br>3.a – Plaintiffs' 2nd RFPs, dated June 21, 2024<br>3.b – Wexford's Initial Responses and Objections, dated July 22, 2024 |
| 4 | Michael A. Mitcheff, *Medications for Opioid Use Disorder (MOUD) programming can and will benefit correctional health care and the greater community*, Wexford Health Sources, Inc., June 21, 2024, *available at* https://www.wexfordhealth.com/medications-for-opioid-use-disorder-moud-programming-can-and-will-benefit-correctional-health-care-and-the-greater-community/ |
| 5 | Email from Michael A. Mitcheff to Wexford Medical Advisory Committee dated July 26, 2022, produced as WEX00050597–0599 |
| 6 | Slide deck titled *Understanding MAT/MOUD and the Correctional Opportunity*, presented by Michael A. Mitcheff to Wexford Health Sources, Inc. C-Suite, produced natively as WEX00093487<br>*(Provisionally Filed Under Seal)* |
| 7 | Email from Michael A. Mitcheff transmitting draft of C-Suite Presentation, dated Oct. 30, 2022, produced as WEX00219301<br>*(Provisionally Filed Under Seal)* |
| 8 | Slide deck titled *Overview of opioid use disorder with Focus on Buprenorphine[,] Suboxone vs Sublocade*, presented by Michael A. Mitcheff at Indiana University School of Medicine in connection with Project ECHO on July 20, 2022, *available at* https://oudecho.iu.edu/resources/downloads/Subclade%20vs%20Sublingual%20Michael%20Mitcheff%207.20.22.pdf |

| | |
|---|---|
| 9 | Slide deck titled *DETOX Update & Pregnant Patients with OUD*, presented by Dr. Neil Fisher at a Wexford Companies SWVRJA HSA/Provider Meeting on April 13, 2022, produced natively as WEX00050329<br>***(Provisionally Filed Under Seal)*** |
| 10 | Excerpts of Wexford Health Sources, Inc. Medical Guidelines, Rev. Feb. 1, 2021, as received from FOIA Request |
| 11 | Excerpts of Wexford Companies Global Addiction Medicine Guidelines, Rev. Jan. 3, 2024, produced as WEX0000001–0144<br>***(Provisionally Filed Under Seal)*** |
| 12 | Wexford Health Sources, Inc. Memorandum titled ADA Guidelines – MAT/MOUD, sent to Major Tammy Grimes, Jail Superintendent of the St. Clair County Sheriff's Department on Nov. 15, 2023, produced as WEX00081927–1930 |