## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

LAUREN SPURLOCK;
HEATHER SMITH; and
SHAWN ZMUDZINSKI, individually and
on behalf of all other similarly situated,

                Plaintiffs,

v.                                    CIVIL ACTION NO. 3:23-0476

WEXFORD HEALTH SOURCES, INCORPORATED,

                Defendant.

### MEMORANDUM OPINION & ORDER

Before the Court is Plaintiffs' Motion for Class Certification, ECF No. 137. Plaintiffs request the Court certify a Damages Class pursuant to Rule 23(b)(3) and an Injunctive Relief Class pursuant to Rule 23(b)(2). For the reasons that follow, the Court **GRANTS** Plaintiffs' Motion for Class Certification but modifies the proposed class definitions.

### BACKGROUND

"[T]he opioid epidemic has led to 'an extraordinary public health crisis that started at least two decades ago and has accelerated over the past decade.'" *City of Huntington v. AmerisourceBergen Drug Corp.*, 96 F.4th 642, 647 (4th Cir. 2024) (citing *City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408, 419 (S.D.W. Va. 2022) (Faber, J.)). This case centers on a correctional health care company's response to that acceleration.

Wexford Health Sources has contracted with state and local authorities to provide comprehensive health care services in approximately 100 correctional facilities across 11 states.

Def.'s Resp. at 3. More than a third of Wexford's patients suffer from Opioid Use Disorder (OUD), according to the company's representative. Pls.' Ex. 8 (Matus Dep.) at 74-76. Plaintiffs allege that Wexford had a uniform policy and practice of denying medication for Opioid Use Disorder (MOUD) to those patients in violation of the medical standard of care. Compl. ¶¶ 6, 10.

The Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the [Plaintiffs'] underlying claim,'" although this is not a "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* A brief discussion of the merits and the evidence already developed in this case is necessary before the Court evaluates Rule 23 prerequisites.

I.    **Wexford's Guidelines on OUD and MOUD**

Plaintiffs initiated this action on July 7, 2023. Compl. at 43. Plaintiffs seek to certify two classes: a forward-looking Injunctive Relief Class and a backward-looking Damages Class. The Damages Class looks back to July 2021. Until September 2022, Wexford had a policy of supervised withdrawal for patients with OUD. Pls.' Ex. 7 (Mitcheff Dep.) at 170-71. Wexford's 2022 guidelines explained the difference between this protocol and MOUD treatment: "Medically supervised opioid withdrawal should NOT be confused with medications for opioid use disorders (MOUD). Medically supervised opioid withdrawal involves treatment of withdrawal symptoms with medications usually over a short period of time while MOUD is a maintenance treatment of opioid use disorders." Pls.' Ex. 11 (2022 Medical Guidelines) at 29. MOUD does not only lessen withdrawal symptoms. As discussed below, MOUD has long-term benefits such as reducing

"cravings that can result in return to [drug] use, overdose and overdose death." Pls.' Ex. 12 (2024 Medical Guidelines) at 35.

Providers were directed to monitor patients using the Clinical Opiate Withdrawal Scale (COWS), which scores the severity of withdrawal based on gastrointestinal upset, tremors, anxiety, bone or joint aches, tears, dilation of pupils, restlessness, sweating, and other symptoms. Pls.' Ex. 10 (2017 Medical Guidelines) at 13, 18. Wexford's director of addiction medicine, Dr. Michael Mitcheff, testified that providers treated symptoms with "Tylenol, ibuprofen, anti-diarrheal agent, anti-nausea vomiting agent, something to help [patients] sleep, [and] Clonidine to help with some of the symptoms." Mitcheff Dep. at 176. The policy had one major exception: Pregnant women received MOUD treatment "ASAP" to prevent withdrawal. Pls.' Ex. 10 (2017 Medical Guidelines) at 13; Mitcheff Dep. at 177-78; *see also* Pls.' Ex. 11 (2022 Medical Guidelines) at 10 (explaining that withdrawal may result in miscarriage, stillbirth, or pre-term labor).

Wexford issued Medically Supervised Withdrawal Guidelines in September 2022. *See* Pls.' Ex. 11 (2022 Medical Guidelines). This policy recognized that patients dependent on opioids "experience particularly intense withdrawal symptoms" for five to seven days, and "post-acute withdrawal syndrome (PAWS) can last over a year." *Id.* at 11. Primary treatment considerations were: "Symptomatic medications such as Clonidine, Zofran, Tylenol and Imodium AD." *Id.* at 13. The policy encouraged MOUD "if a patient comes in on this treatment" and for new patients with OUD "if acceptable to client leadership." *Id.* at 11. The guidelines advised that opioid withdrawal "results in significant symptomatology, which can be markedly reduced with targeted therapies or prevented with continuation or initiation of medications for opioid use disorder (MOUD)." *Id.* at 30. The 2022 guidelines included comparisons of four types of MOUD treatment: buprenorphine, buprenorphine/naloxone, methadone, and naltrexone. *Id.* at 79-80.

The Food and Drug Administration (FDA) has approved three medications to treat OUD: buprenorphine, methadone, and naltrexone. *Information about Medications for Opioid Use Disorder (MOUD)*, FDA (Dec. 26, 2024), https://perma.cc/6HCU-BU9U. Buprenorphine/naloxone formulations contain naloxone to prevent abuse. *What are the treatments for heroin use disorder?*, National Institutes of Health (April 13, 2021), https://perma.cc/F9HL-VBD9.

Wexford updated its guidelines again during the pendency of this action. The 2024 policy "encourages continuation of MOUD if a patient comes in on this treatment" and recommends that patients with OUD "should be offered MOUD and not taken through the full withdrawal process unless the patient prefers using Naltrexone, or prefers abstinence." Pls.' Ex. 12 (2024 Medical Guidelines) at 13. The policy further provides that clinicians may provide "clinically appropriate medically supervised withdrawal" where MOUD is not available "based on facility rules." *Id*. On the next line, the policy states in bold text: "If a patient needs to go through medically supervised withdrawal, a tapering dosage of buprenorphine is recommended to treat the withdrawal." *Id.*; *see also* Mitcheff Dep. at 174 (explaining that in some facilities providers use buprenorphine to make withdrawal "smoother" and "much less symptomatic"). Primary treatment considerations were: "If actively addicted, transition onto buprenorphine then taper off gradually (if unable or unwilling to stay on transmucosal buprenorphine)" and "Symptomatic medications such as Clonidine, Zofran, Tylenol and Imodium AD." Pls.' Ex. 12 (2024 Medical Guidelines) at 15. In a section titled "Opioid Withdrawal," the guidelines state:

> It should be noted that Wexford recommends a comprehensive MOUD program that includes all three FDA-approved medications but we also understand that we are required to follow the client's policies. . . . **It is Wexford Health's recommendation that consideration be given to initiating ongoing treatment for OUD with buprenorphine. This will prevent severe opioid withdrawal, help with cravings that can result in return to use, overdose and overdose death.**

*Id.* at 35.

Wexford concedes that MOUD is an appropriate treatment for OUD and often the best treatment for patients with OUD. Def.'s Resp. at 1. Wexford's corporate addiction program manager, Kayleigh Matus, testified that Wexford has some level of OUD screening, MOUD treatment, or both available "in 87 percent of [its] contracts."[1] Matus Dep. at 160. Some programs are rolled out in phases: "phase one is continuation [of MOUD for those already on MOUD], phase two is induction." *Id.* at 61-62. However, Plaintiffs argue, "Wexford's practice in the vast majority of facilities in which it operates continues to be to force significant portions of its patient population into painful withdrawal in contravention of all medical standards of care." Pls.' Mem. at 2. Wexford argues that it has "worked tirelessly to persuade local governments to adopt some form of MOUD program within their facilities" but "does not have carte blanche to offer MOUD" in every facility. Def.'s Resp. at 4-5. One facility gave Wexford "a hard no" on offering MOUD. Matus Dep. at 214.

Cost was also a concern. *Id.* at 69; *see also* Mitcheff Dep. at 48-49 (explaining that Wexford was a "low profit business" and providing MOUD "could break a company"). Wexford covers the "pharmaceutical costs" of MOUD in some facilities, while other facilities are seeking grants or opioid settlement funds to pay for OUD treatment. Matus Dep. at 38-39. In addition to pharmaceutical costs, additional staffing is a "huge component" of rolling out MOUD programs.

---

[1] Matus testified: "It's taken me 18 months to build programs in 87 percent of our contracts. Although they not -- may not all be inclusive of screening universally and inductions, they are -- came a heck of a long way from doing absolutely nothing." Matus Dep. at 160. Earlier in the deposition, "induction" was defined as "treatment with MOUD . . . or offering treatment of MOUD with those diagnosed as OUD." *Id.* at 57. Deposition testimony did not further clarify what level of programming is included in 87 percent of contracts, except that most facilities "now have an MOUD program where patients are continued on their medications for opioid use disorder and screened." *Id.* at 28.

*Id.* at 66; *see also id.* at 42, 62, 68. "A lot of" Wexford's clients are "attempting to obtain additional funding" before they move from phase one to phase two of OUD treatment programming. *Id.* at 62-63. Matus testified that Wexford understands that comprehensive OUD screening and treatment may not be available at a facility due to limitations "from lack of staffing, lack of security, lack of funding." *Id.* at 63

Plaintiffs argue that Wexford put profits ahead of the health of its patients—while transferring millions of dollars to its holding company, the Bantry Group Corporation, which then paid out shareholder distributions. Pls.' Mem. at 5 (citing Pls.' Exs. 15, 24-26). The motivations behind Wexford's policies are highly contested. So is the question of whether Wexford ultimately "had the power to enforce" a policy on MOUD. *See* Def.'s Resp. at 13; Pls.' Reply at 2-3. At a fundamental level, Plaintiffs contest whether Wexford can agree to provide comprehensive medical services but carve out treatment for certain chronic conditions—whether MOUD for OUD or insulin for diabetes. Pls.' Mem. at 8. As discussed in more detail below, these are questions better addressed at a later stage of these proceedings.

## II.    The Standard of Care

The parties agree that MOUD significantly reduces the odds of relapse, overdose, and death. Pls.' Ex. 12 (2024 Medical Guidelines) at 8, 35; Mitcheff Dep. at 175-76, 187. Wexford's 2022 policy noted: "Although opioid withdrawal rarely causes death directly, it can occur indirectly from suicidality, overdose or the stress that withdrawal can put on a comorbid condition such as heart disease." Pls.' Ex. 11 at 30.

Mitcheff offered the example of a patient with OUD and severe coronary disease who "could be put into an adrenergic state and could have a heart attack" without MOUD. Mitcheff Dep. at 187-88. Personally, he "never had anybody have a heart attack going through opioid

withdrawal or had a stroke or anything like that" but saw "a lot of people very uncomfortable." *Id.* at 190. He testified that the prevalence of overdose in the weeks following release is "staggering." *Id.* at 119. In New Hampshire, Wexford instituted a MOUD program that "ha[s] been able to impact the post-discharge overdoses significantly." *Id.* He testified that MOUD could have helped reduce the number of overdoses in Alabama, where there was a "significant" number of overdose deaths. *Id.* at 192-93.

Mitcheff testified that Wexford recognizes other benefits of MOUD, including increasing employment and reducing illicit drug use. Mitcheff Dep. at 193-94. A 2023 presentation to Wexford executives by Wexford's assistant chief medical officer listed the following evidence-based benefits of MOUD: "Decrease illicit opioid use; Reduce transmission of Hepatitis C and HIV; Decrease criminal behavior; Reduce sexual risk behaviors (e.g., trading sex for money/drugs); Improve social functioning; Retain people in treatment; Decrease overdose and death; Increase employment; [and] Decrease in domestic violence." Pls.' Ex. 20 at 57.

Mitcheff testified that there "was evidence" supporting MOUD in 2017, but it was "nowhere near as robust" as it is in 2025. Mitcheff Dep. at 195-96. He said that since "maybe 2018, 2019, there's been a real push to make it the community standard of care and really push it everywhere, including corrections." *Id.* at 196. Mitcheff and Wexford's chief medical officer prepared an internal "C-Suite" presentation advocating for MOUD as "the community standard" and warning that Wexford faced legal risk if it did not provide MOUD. Pls.' Ex. 6 at 51 ("Class action lawsuits are coming!!!").

Plaintiffs have presented substantial evidence that MOUD is the standard of care for OUD treatment. In 2015, the American Society of Addiction Medicine recommended pharmacotherapy (i.e., MOUD) for OUD patients in the criminal justice system. Pls.' Ex. 29 at 12. This treatment

"ha[d] been shown to be effective and is recommended for prisoners and parolees regardless of the length of their sentenced term." *Id.* Plaintiffs point the Court to recommendations for MOUD from the following organizations, each of which issued the recommendations in 2021 or earlier: the National Council for Behavioral Health and Vital Strategies; the National Sheriffs' Association and the National Commission on Correctional Health Care (joint guidance); the American Medical Association; the Substance Abuse and Mental Health Services Administration; and the National Commission on Correctional Healthcare. Pls.' Ex. 25; Pls.' Mem. at 12-14.

A 2021 investigation by the U.S. Department of Justice (DOJ) found staff at a New Jersey jail "acted with deliberate indifference to inmates' serious medical needs by categorically denying" MOUD. Pls.' Ex. 16 at 6. In 2022, the DOJ published guidance explaining "how the Americans with Disabilities Act (ADA) protects people with opioid use disorder (OUD) who are in treatment or recovery, including those who take medication to treat their OUD." *Justice Department Issues Guidance on Protections for People with Opioid Use Disorder under the Americans with Disabilities Act*, U.S. Department of Justice (April 5, 2022), https://perma.cc/7F7X-GT4E.

In 2023, Wexford sent a letter to a jail reaching the following conclusion after a review of relevant case law, federal guidelines and investigations, and articles:

> In addition to continuing MAT for inmates in active programs, it is our opinion that a prison must also screen, identify and offer MAT to both inmates and pretrial detainees with OUD, regardless of recent illegal drug use and regardless of current participation in a MAT/MOUD program. While incarcerated, the prison health system is the only treatment available to these individuals. Furthermore, in addition to the ADA, recent court decisions have found that the Fourteenth and Eighth Amendments of the U.S. Constitution require that those with OUD have access to MAT/MOUD when incarcerated.

Pls.' Ex. 18 at 3.

### III.    The Plaintiffs

The following summaries are drawn from Plaintiffs' Complaint, Plaintiffs' responses to interrogatories, and Defendant's expert report. Defendant's physician expert reviewed Plaintiffs' allegations and medical records. Def.'s Ex. 1 at 2.

The Complaint and exhibits refer to medications by their brand names. Narcan is a prepackaged nasal spray designed to deliver naloxone, which is a medicine that rapidly reverses an opioid overdose. *Naloxone DrugFacts*, National Institutes of Health (Jan. 11, 2022), https://perma.cc/7FN8-W3US. This drug "is not a treatment for opioid use disorder." *Id.* Suboxone is a formulation of buprenorphine that also contains naloxone "to prevent attempts to get high by injecting the medication." *What are the treatments for heroin use disorder?*, National Institutes of Health (April 13, 2021), https://perma.cc/F9HL-VBD9.

#### a.  Laura Spurlock

Laura Spurlock is a resident of Huntington, West Virginia. Compl. ¶ 12. She developed an opioid dependence after she was prescribed opioids to ease pain after surgery. Pls.' Ex. 31 at 22. Spurlock was incarcerated at Western Regional Jail (WRJ) in Barboursville, West Virginia for three months in spring 2023. Compl. ¶ 12. Wexford was the medical contractor for the jail. *Id.* ¶ 13. Spurlock had previously been diagnosed with OUD and treated with prescribed MOUD. *Id.* ¶ 14. When she arrived at WRJ, Spurlock told Wexford staff that she had OUD and needed treatment. *Id.* She had MOUD, including Suboxone, in her possession upon intake. Pls.' Ex. 31 at 18; *see also* Def.'s Ex. 1 at 19. She did not receive MOUD and suffered "terrible withdrawal," including pain, difficulty sleeping, nausea, and other physical discomfort. Compl. ¶ 14.

### b. Heather Smith

Heather Smith became addicted to opioids in early 2022 "following a car crash that totaled her car and led to the loss of her job, for which a working car was a requirement." Pls.' Ex. 32 at 22; Compl. ¶ 153. Medical records document Smith's statements that she never used opioids before 2022 but used heroin daily by the end of that year. *See* Def.'s Ex. 1 at 21-25 (reviewing medical records from 2014 to 2022). "Opioids were easily available to her in her small county in West Virginia, and she quickly became addicted. In order to get her life back on track, she entered a rehab facility that began prescribing her Suboxone, a type of MOUD." Pls.' Ex. 32 at 22. Smith graduated from that program on December 29, 2022. Def.'s Ex. 1 at 26. In January 2023, she learned there was a warrant out for her arrest and turned herself in to law enforcement. Compl. ¶ 16. She brought her Suboxone and other prescribed medications. *Id.*; *see also* Def.'s Ex. 1 at 27.

Smith was incarcerated at South Central Regional Jail (SCRJ) in Charleston, West Virginia for nine days. Compl. ¶ 16, 158; Def.'s Ex. 1 at 28-29. Wexford was the medical contractor for the jail. Compl. ¶ 16. "Wexford verified her prescriptions, including one for MOUD, but nevertheless refused to provide her with her prescribed MOUD." *Id.* Wexford initially continued to provide her other prescribed medications—Lexapro, Vistaril, and trazodone—before discontinuing Vistaril and trazodone "as neither are used this dose, this setting."[2] Def.'s Ex. 1 at 28-29. For her first four days at the jail, Smith "was placed on an opiate medically supervised withdrawal protocol with prescribed medications of Bentyl, clonidine, folate, ibuprofen, multivitamins, Pepto-Bismol, and Zofran for opiate withdrawal symptoms." *Id.* at 28.

---

[2] Lexapro, Vistaril, and trazodone are used to treat anxiety and depression. *Escitalopram (oral route)*, Mayo Clinic (July 1, 2025), https://perma.cc/HJ8F-QXZD; *Hydroxyzine (oral route)*, Mayo Clinic (July 1, 2025), https://perma.cc/2399-TBFN; *Trazodone (oral route)*, Mayo Clinic (July 1, 2025), https://perma.cc/38NS-7APH.

Defendant's expert report states that, the day after intake, a Wexford nurse received orders "to continue Ms. Smith on the MAT program while at the SCRJ." *Id.* at 29. It appears that she did not receive the treatment. Two days after intake, "Ms. Smith placed a sick call request which stated: 'I need my meds.'" *Id.* Medical records from the week after Smith's release document her statement that she did not receive MOUD in jail. *Id.* at 30.

In jail, Smith suffered "terrible withdrawal," including pain, difficulty sleeping, nausea, sweating, and "her arms and legs jerking to the extent that she could not sleep." Compl. ¶ 17. Her "cravings returned as powerfully as ever—and she knew that there were opioids available in the jail because another woman overdosed during her stay." *Id.*

Additionally, Smith alleged that she was "forced to remain in a 'quarantine' (solitary confinement) unit for the first five days of her withdrawal," without access to showers, recreation, prescription medications other than MOUD, and non-prescription baby aspirin needed for reasons unrelated to OUD. Compl. ¶ 157-58.

### c.  Shawn Zmudzinski

Shawn Zmudzinski "became addicted to opioids as a teenager in Farmington, New Mexico after his doctor prescribed him opioids for various injuries he suffered as a competitive skateboarder." Compl. ¶ 18. He began taking Suboxone in 2012. Def.'s Ex. 1 at 33. He filled a Suboxone prescription weeks prior to his incarceration in late 2021. *Id.* at 40. "Zmudzinski was arrested for a technical probation violation for associating with another person with a felony conviction—an individual he was attending sobriety meetings with—and forced to withdraw from his MOUD while incarcerated[.]" *Id.* ¶ 20.

He was incarcerated for one month at a facility where Wexford did not provide medical services before he was transferred to a facility where Wexford provided services. Compl. ¶ 20;

Def.'s Resp. at 9; Def.'s Ex. 1 at 41-42. He was in a Wexford-staffed facility for approximately three months. Def.'s Ex. 1 at 33-43. Notes from his intake into the Wexford-staffed facility document that he told a provider he "was on Suboxone program prior to county jail." *Id.* at 42. He denied all other drug use in the prior 12 months. *Id.*

"Throughout his incarceration, Plaintiff verbally requested his previously prescribed MOUD treatment from Wexford employees." Pls.' Ex. 33 at 19. He suffered withdrawal symptoms including pain, diarrhea, constipation, chills, and cold sweats. Compl. ¶ 20. He was not able to sleep or eat. *Id.* "He also feared another heart attack, as he had previously had three heart attacks, all during opioid withdrawal." *Id.*

His opioid cravings returned when he was released in December 2021. *Id.* On the day he was released, he told a telemedicine provider that he had a history of OUD but had been clean for five years. Def.'s Ex. 1 at 43. According to medical records, he refused a dose of Narcan when he was released. *Id.* Less than two months later, he suffered a heroin overdose. *Id.* He resumed MOUD treatment in early 2023. *Id.* at 44.

### IV.    Plaintiffs' Claims

Plaintiffs bring *Monell* claims for violations of the Eighth and Fourteenth Amendments.[3] Compl. ¶¶ 179-200. "To state a claim for deliberate indifference to a medical need . . . a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed

---

[3] Plaintiffs also brought claims for negligence on behalf of New Mexico and West Virginia subclasses. Compl. ¶¶ 201-212. They did not move to certify New Mexico and West Virginia subclasses. *See* Pls.' Mot.; Pls.' Mem.

an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed." *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). A pretrial detainee's claim arises under the Fourteenth Amendment. *Id.* A "more demanding Eighth Amendment standard" applies to individuals incarcerated after a formal adjudication of guilt. *Id.* at 612. Those bringing claims under the Eighth Amendment must show "that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Id.* at 611. Plaintiffs seek compensatory damages for pain and suffering under the Eighth and Fourteenth Amendments, punitive damages under the Eighth and Fourteenth Amendments, costs and attorneys' fees, and other relief. Compl. at 43.

## LEGAL STANDARD

The class action device is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)). "The premise is that 'litigation by representative parties adjudicates the rights of all class members.'" *G.T.*, 117 F.4th at 202 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998)).

Rule 23(a) of the Federal Rules of Civil Procedure provides that one or more members of a class may sue as representative parties on behalf of all members if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition to these four prerequisites, the class action must fit within "one of the three categories enumerated in Rule 23(b)." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th

-13-

Cir. 2003). Here, Plaintiffs move for certification of the proposed Injunctive Relief Class under Rule 23(b)(2) and for certification of the proposed Damages Class under Rule 23(b)(3). Pls.' Mem. at 32-34.

Certification under Rule 23(b)(2) is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the . . . remedy warranted." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (citing *Wal-Mart*, 564 U.S at 360). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of the Rule 23(b)(2) class action. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Certification under Rule 23(b)(3) is appropriate when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Parties seeking class certification "must present evidence that the putative class complies with Rule 23," not only plead compliance with the rule. *EQT*, 764 F.3d at 357. "It is the plaintiffs' burden to demonstrate compliance with Rule 23, but the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *Id.* at 358 (citing *Wal-Mart*, 564 U.S. at 351).

## DISCUSSION

### I.    Ascertainability and Redefined Classes

Rule 23 contains an implicit threshold requirement of ascertainability: Members of the proposed class must "be 'readily identifiable.'" *EQT*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir.1972)). A court must be able to identify the class members using "objective criteria." *EQT*, 764 F.3d at 358. Although plaintiffs need not be able to identify the class members at the time of certification, class members must be identifiable without "extensive and individualized fact-finding or 'mini-trials.'" *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

Plaintiffs proposed a new set of class definitions to address ascertainability issues discussed at oral argument. These definitions are:

> **Damages Class:** All individuals who were confined at a Listed Facility during the applicable Relevant Time Period, who (1) (a) had a diagnosis of Opioid Use Disorder (OUD) at the time of intake or during such incarceration, (b) had a prescription for FDA-approved Medication for Opioid Use Disorder (MOUD) at the time of intake, or (c) were monitored for opioid withdrawal during such incarceration; and (2) who were not screened for OUD or offered MOUD; and (3) who were thereafter released from the Listed Facility. [4]

> **Injunctive Relief Class:** All persons who are currently, or will in the future, be confined at a carceral facility for which Wexford provides comprehensive medical

---

[4] The "Listed Facilities" along with their corresponding "Relevant Time Period" are as follows: Alabama Department of Corrections (7/7/2021 to 3/31/2023), Butler County Prison (7/7/2021 to 9/30/2021), Douglas County Jail (9/1/2024 to date of judgment), Erie County Prison (7/7/2021 to 12/31/2023), Illinois Department of Corrections (7/7/2021 to date of judgment), Mohave County Adult Detention Center (6/7/2022 to date of judgment), Navajo County Detention Center (3/8/22 to date of judgment), State of New Mexico Corrections Department (7/7/2020 to date of judgment), Nueces County Jail Facilities (12/1/2023 to date of judgment), Orleans Parish Jail (6/1/2024 to date of judgment), Pinal County facilities (7/7/2021 to date of judgment), St. Clair County Jail (7/7/2021 to date of judgment), St. Lucie County Jail (7/7/2019 to 3/31/2023), Southwest Virginia Regional Jails (7/7/2021 to date of judgment), West Virginia Division of Corrections & Rehabilitation Prisons and Jails (7/7/2021 to date of judgment), Western Virginia Regional Jail at Roanoke (7/1/2024 to date of judgment), Westmoreland County Prison (7/7/2021 to 8/30/2022), and Yavapai County Jail Facilities (7/7/2021 to date of judgment). Pls.' Suppl. Notice; Pls.' Ex. 1.

and/or healthcare services, who are diagnosed with OUD, test positive for opioids, or are monitored for opioid withdrawal.

Pls.' Suppl. Notice.

Each of the criteria for class membership is tied to Wexford's own medical records and documentation. The parties do not contest section three of the Damages Class definition. Records exist to ascertain which individuals have been released from prisons and jails.

As to the second section of the Damages Class definition, Wexford has records of its own OUD screening and MOUD treatment. However, as Defendant argues, there may be benign reasons why any given individual did not receive MOUD. A provider may determine that an individual is not a good candidate for MOUD, or an individual may have a preference against MOUD. Def.'s Resp. at 19. This action is not about the cases where a provider makes a medical determination that MOUD is not appropriate for a given patient. It is centered around the complaint that Wexford does not allow providers to make individualized determinations about the best course of treatment—instead, providers must defer to Wexford's uniform policy limiting MOUD in the facility.

Thus, the Court finds that including every individual who was not "offered MOUD" is overbroad. This problem "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 825 (7th Cir. 2012); *see also* 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1760 (4th ed.) ("[A court] has discretion to limit or redefine the class in an appropriate manner to bring the action within Rule 23."). The Court strikes the current language of section two of the Damages Class definition and replaces it with "who were not continued on MOUD, if already prescribed MOUD, or screened for MOUD induction."

-16-

In section one of the Damages Class definition, most of the criteria flow from intake documentation. *See* ECF No. 164-1 (exemplar intake medical history and screening form documenting current medications and whether patient had "any medical problems we should know about," used drugs, previously experienced "withdrawal problems," and was "currently detoxing"); *see also* Matus Dep. at 144 (explaining that urine drug tests are part of the intake process). To foreclose any ambiguity as to which individuals "had a diagnosis of Opioid Use Disorder (OUD) at the time of intake," the class will only include individuals who had an OUD diagnosis prior to intake *and* reported that information during the intake process. If a Wexford provider diagnoses an individual with OUD during incarceration, the provider will document the new diagnosis. The same is true for providers who monitor opioid withdrawal and treat withdrawal symptoms.

It is logical that the criteria for class membership flow from Wexford's own records because Plaintiffs assert claims of deliberate indifference. An Eighth Amendment deliberate indifference claim "requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). Well-defined classes ensure that Wexford had knowledge of each class member's serious medical condition, medical need, or risk of harm. Here, the risk of harm comes from the increased risks of withdrawal, relapse, overdose, and death for those who would benefit from MOUD if not for a policy limiting access to the treatment.

The criteria for membership in the Injunctive Relief Class similarly flow from Wexford's own records. Wexford maintains records of its current patients. Wexford providers document reported or new OUD diagnoses, positive test results, and monitoring for opioid withdrawal. Again, to foreclose any ambiguity, the class will only include individuals who have an OUD

-17-

diagnosis prior to intake *and* report that information during the intake process; receive a diagnosis while incarcerated; test positive for opioids while incarcerated; or are monitored for opioid withdrawal while incarcerated.

The Court revises the class definitions as follows:

**Damages Class:** All individuals who were confined at a Listed Facility during the applicable Relevant Time Period, who (1) (a) had a diagnosis of Opioid Use Disorder (OUD) at the time of intake, and reported that diagnosis during intake, or were diagnosed during such incarceration, (b) had a prescription for FDA-approved Medication for Opioid Use Disorder (MOUD) at the time of intake, or (c) were monitored for opioid withdrawal during such incarceration; and (2) who were not continued on MOUD, if already prescribed MOUD, or screened for MOUD induction; and (3) who were thereafter released from the Listed Facility.

**Injunctive Relief Class:** All persons who are currently, or will in the future, be confined at a carceral facility for which Wexford provides comprehensive medical and/or healthcare services, who have a diagnosis of Opioid Use Disorder (OUD) at the time of intake, and report that diagnosis during intake, or are diagnosed during such incarceration, test positive for opioids during such incarceration, or are monitored for opioid withdrawal during such incarceration.

The revised class definitions solve the ascertainability problems of Plaintiffs' proposed class definitions. For example, the original class definition included those "who were diagnosed with OUD, tested positive for opioids, or were monitored for opioid withdrawal using the Clinical Opioid Withdrawal Scale (COWS) prior to or during such confinement, who were not screened for OUD or offered MOUD, and who were thereafter released from the Listed Facility." Pls.' Mem. at 2-3. Defendant argued, correctly, that this definition could include individuals who did not have OUD but tested positive for opioids at some point years prior to incarceration. Def.'s Resp. at 18. Additionally, the original class definition could require a review of "lifelong medical records (and whatever other records may reveal a positive opioid test)." *Id.* at 19. This process would require extensive and individualized fact-finding.

Under the new class definitions, there is no need to review lifelong medical records. Class members can be identified using Wexford's own records. No individualized determinations are

necessary. For some class membership criteria, Wexford providers make the relevant individualized determinations in the ordinary course of business: Wexford providers administer drug tests upon intake, verify prescription medications, note diagnoses, and in some cases diagnose serious medical conditions such as OUD.

## II.    Standing

"[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring," but that person's "standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435-36 (2021). "Every class member must have Article III standing in order to recover individual damages." *Id.* at 431. In *TransUnion*, the Supreme Court explicitly did not "address the distinct question whether every class member must demonstrate standing *before* a court certifies a class." *Id.* at 431 n.4.

Wexford argued, correctly, that Plaintiffs' first proposed Damages Class definition included individuals who tested positive for an opioid but did not have OUD. Def.'s Resp. at 18. Wexford pointed the Court to a then-pending case at the Supreme Court concerning "whether Article III precludes certification of a damages class defined in a way that necessarily includes uninjured members," Def.'s Resp. at 18 n.6, which has since been dismissed as improvidently granted. *Lab'y Corp. of Am. Holdings v. Davis*, 145 S. Ct. 1608 (2025).

The Court's revision of the Damages Class definition addresses Wexford's standing concerns. No longer does the Damages Class include individuals who tested positive for opioids but did not have OUD. Neither does the class include "the hypothetical member who was diagnosed with OUD fifteen years before confinement and made a full recovery a decade ago." Def.'s Resp. at 18. The class includes those who had a diagnosis of OUD at the time of intake, and

reported that diagnosis during intake, or were diagnosed during incarceration. The hypothetical person who was diagnosed with OUD in 2009, took Suboxone for some period of years, made a complete recovery by 2014, and was booked into the Western Regional Jail in 2025 is not included as a class member because that individual did not have an OUD diagnosis or a prescription for MOUD at the time of intake. That hypothetical person will not be diagnosed or monitored for withdrawal during incarceration. All members of the Damages Class suffered from OUD and either (1) did not receive prescribed MOUD, or (2) did not receive individualized medical care involving consideration of MOUD as a course of treatment.

### III.    Liability

Wexford dedicates much of its brief to the argument that it cannot be held liable for a policy limiting MOUD because "the nature and extent of MOUD access in jails and prisons is determined by what local governments will accommodate." Def.'s Resp. at 5. Wexford cites a preliminary injunction order requiring a county jail in Maine to provide an incarcerated plaintiff "with her prescribed buprenorphine . . . in whatever way the Defendants deem most appropriate in light of the [jail's] security needs." *Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146, 162 (D. Me.), *aff'd*, 922 F.3d 41 (1st Cir. 2019). The jail in that case had a set of policies governing its contract with a health center that provided medical services at the jail. One of those policies provided: "we do not use opioid, or opioid replacements in the [jail]." *Id.* at 152. The health center "offered to have one of its providers certified to prescribe buprenorphine in the Jail," but "the Jail did not accept that proposal." *Id.* at 153. The health center was not a defendant. The jail instituted its policy for "security reasons," despite an "offer of significant funds from the State" to offer MOUD. *Id.* at 152, 160. "When asked whether she was aware of studies suggesting that forced withdrawal from [MOUD] can lead to long-term negative outcomes for patients with opioid use disorder,

[defendants' 30(b)(6) representative] not only answered in the negative but stated that she tends not to read studies because she 'find[s] them boring.'" *Id.* at 152. This decision did not involve the question of the health center's liability. Moreover, the Maine jail's explicit policy prohibiting MOUD highlights the lack thereof in the record before this Court.

Only one facility gave Wexford a "hard no" on offering MOUD: the St. Clair County Jail in Illinois. Matus Dep. at 214. Matus testified that the facility has been "very, very difficult to work with." Matus Dep. at 214. Mitcheff testified that Wexford "[hasn't] been able to get an audience with them, but [Wexford] did send a letter, and they clearly understand [Wexford's] position on" MOUD. Mitcheff Dep. at 268-69; *see also* Def.'s Ex. 2 (2023 letter from Wexford to St. Clair County Jail Superintendent). Douglas Mote, Wexford's director of jail operations, testified that he "would say it's more apathy, that, you know, there has really been no response yes or no from the county as to whether they're going to let us do this or not." Pls.' Ex. 9 (Mote Dep.) at 120-21. Mote testified that a security staff shortage was "probably the reason why they have not pursued it at this time. But yet, [Mote] really [has] not been told that, but [he] know[s] that to be a fact because [he's] there on a regular basis, and [he] know[s] how many vacancies they have." *Id.* at 121. Cost and staffing have been factors in Wexford's limited MOUD treatment at other facilities. *See, e.g.,* Matus Dep. at 38-39 (describing clients "trying to obtain funding to either have an MOUD program or expand their existing MOUD program"); Mote Dep. at 110 (describing lack of staffing as a roadblock "across the country"); Mitcheff Dep. at 42-47 (explaining that cost was a barrier for certain medications but facilities "just simply did not have the staff to treat this many people").

Wexford takes an active role in determining what programming is available under its contracts. Matus described "a collaborative effort between Wexford and the client." Matus Dep.

at 69. Mote testified that Wexford proactively educated and made recommendations to its clients, many of whom were "not educated on the topic" of MOUD. Mote Dep. at 104. In his view, few facilities would have MOUD programs "if [Wexford] would have waited on the client to come to [Wexford]." *Id.* Mitcheff testified that MOUD programs "would be something [Wexford] would have to go to the clients and say, can you get some of this -- this settlement money to help pay for this because this is not in the contract. It's not something we signed up for, but it's certainly something we recommend." Mitcheff Dep. at 47.

Another district court in the Fourth Circuit rejected Wexford's argument that contractual limits on its policymaking authority shielded it from liability on a *Monell* claim for inadequate medical care. *See Bost v. Wexford Health Sources, Inc.*, No. CV ELH-15-3278, 2022 WL 4290528, at *2, 34-38 (D. Md. Sept. 16, 2022) (denying Wexford's motion for summary judgment). As here, Wexford argued it did not have final policymaking authority. *Id.* at *34. The district court observed that "Wexford employees offered testimony consistent with the view that Wexford had authority to develop at least some policies pursuant to the Medical Contract," even if local authorities ultimately had the power to overrule those policies. *Id.* at *37. The contract required local authorities to approve Wexford's policies. *Id.* at *38. The court held that a reasonable juror could determine that the local authority "delegated at least some final policymaking authority to Wexford with respect to the provision of medical care." *Id.* Here, Wexford's corporate representatives testified that Wexford has a "collaborative" contract negotiation process involving recommendations and education for clients. The evidence in the record suggests that Wexford has at least some role in the policymaking process. Whether Wexford ultimately had the power to enforce a policy on MOUD is a fact-intensive question better addressed at a later stage of these proceedings.

-22-

IV.    **The Rule 23(a) Prerequisites**

a.    **Numerosity**

Rule 23 requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no "mechanical test" or minimum class member requirement, *Holsey v. Armour & Co.,* 743 F.2d 199, 217 (4th Cir. 1984), but "courts generally find numerosity exists when a class has 40 or more members," *Baxley v. Jividen*, 338 F.R.D. 80, 86 (S.D.W. Va. 2020).

The numerosity requirement is easily met. Wexford does not contest the numerosity prerequisite. *See* Def.'s Resp. In another class action before this Court involving West Virginia's regional jails, the Court noted the defendant's estimate that West Virginia's regional jails processed nearly 50,000 inmates in 2018 and 2019 and housed several thousand inmates on a single day in 2020. *Baxley*, 338 F.R.D. at 86. The Court found that joinder of all individuals who are, or will be, admitted to a jail in West Virginia was impracticable due to "the overwhelmingly large and continuously changing size of the class." *Id.* at 86-87.

Here, the proposed Damages Class includes individuals with OUD in those regional jails and more than a dozen other prisons, jails, and groups of prisons and jails. The Injunctive Relief Class draws from an even larger set of facilities. Wexford provides services in approximately 100 correctional facilities, and more than one third of the individuals in those facilities have OUD. Matus Dep. at 74-76. Mitcheff testified in January 2025 that Wexford was "treating probably over 6,000 people with MOUD." Mitcheff Dep. at 127. Even 20 class members from each Wexford-served facility would result in a class with thousands of members. Other courts have found that joinder is impracticable when presented with similar or smaller class sizes. *See, e.g., Postawko v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 3185155, at *6

(W.D. Mo. July 26, 2017) (finding numerosity satisfied given class of at least 2,000 inmates), *aff'd*, 910 F.3d 1030 (8th Cir. 2018); *Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014) (finding numerosity satisfied given class of 1,200 prisoners). The Court finds that joinder is impracticable.

### b.  Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (cleaned up). In *Wal-Mart*, the seminal case on the commonality requirement, the Supreme Court reversed certification of a class of more than one million current and former female employees of Wal-Mart who alleged the company's culture permitted gender bias to infect pay and promotion decisions. 564 U.S. at 338-43.

Individual Wal-Mart supervisors allegedly discriminated against female employees, but there was no "glue holding the alleged *reasons* for all those decisions together." 564 U.S. at 352. The Supreme Court endorsed its explanation of the commonality prerequisite in an earlier employment discrimination case. *Id.* (citing *Falcon*, 457 U.S. at 152). In both *Wal-Mart* and *Falcon*, the proposed classes failed due to a "conceptual gap" between a claim that an individual was denied a promotion on discriminatory grounds and the existence of a class of persons who suffered the same injury as that individual. *Wal-Mart*, 564 U.S. at 353 (citing *Falcon*, 457 U.S. at 157-58).

The Supreme Court suggested two ways to close this gap: showing (1) the employer used a biased testing procedure to evaluate candidates or (2) the employer operated under a "general policy of discrimination." *Wal-Mart*, 564 U.S. at 353 (quoting *Falcon*, 457 U.S. at 157-59).

Neither the *Wal-Mart* plaintiffs nor the *Falcon* plaintiff identified a general policy of discrimination.

In *Wal-Mart*, the Supreme Court noted that Wal-Mart's official policy forbade sex discrimination. 564 U.S. at 353. The only policy of sex discrimination that plaintiffs established was a "'policy' of *allowing discretion* by local supervisors over employment matters." *Id.* at 355. The instant case is dissimilar. Plaintiffs allege that Wexford had a uniform policy of denial of MOUD in spite of the standard of care. That policy constrained local medical providers' discretion. Until late 2022, Wexford's policy did not allow providers to treat OUD with MOUD unless the patient was pregnant. Mitcheff Dep. at 170-73; *see also* Pls.' Ex. 10 (2017 Medical Guidelines). The 2022 and 2024 guidelines allow provider discretion in some circumstances but not others. Pls.' Ex. 11 (2022 Medical Guidelines) at 11 (deferring to facility preferences on MOUD); Pls.' Ex. 12 (2024 Medical Guidelines) at 13 (same).

Plaintiffs close the "conceptual gap" that doomed the *Falcon* and *Wal-Mart* plaintiffs because they tie their claims to Wexford's company-wide, uniform policies. When Wexford providers denied Plaintiffs their prescribed medication, the glue holding those actions together was Wexford's company-wide policy limiting access to MOUD.

For certification, there must be a common question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "Although the rule speaks in terms of common questions, what matters to class certification is the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *EQT*, 764 F.3d at 360 (cleaned up). The central contention of this action is that MOUD is the standard of care for OUD treatment, even in the correctional setting, and Wexford's policy

-25-

limiting access to MOUD constitutes deliberate indifference. If that contention is true, its truth "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

A brief discussion of the Eighth Amendment deliberate indifference claim shows how common questions drive this litigation. The Eighth Amendment of the United States Constitution is violated when a corrections official is deliberately indifferent "to a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). A plaintiff must satisfy a two-prong test showing (1) the injury or deprivation was "objectively, 'sufficiently serious'" and (2) the official has acted with "'deliberate indifference' to inmate health or safety." *Id.* at 834.

The first prong requires that deprivation poses "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from . . . exposure to the challenged conditions." *De'Lonta*, 330 F.3d at 634 (internal quotation marks and citation omitted). "In inadequate medical care cases, the Fourth Circuit has required plaintiffs to demonstrate officials' deliberate indifference to a serious medical need that has either been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Baxley v. Jividen*, 508 F. Supp. 3d 28, 55 (S.D.W. Va. 2020) (cleaned up). Here, the classes include only individuals whose records indicate either an OUD diagnosis or other evidence of opioid dependence.

As to the second prong, the Fourth Circuit requires that an official "actually know of and disregard an objectively serious condition, medical need, or risk of harm." *De'Lonta*, 330 F.3d at 634. Class members are identified according to Wexford's documentation. Therefore, Wexford had knowledge of class members' serious condition. Wexford's policy allegedly disregarded the need for OUD treatment despite the company's recognition that doing so would increase the risks

of relapse, overdose, and death. Plaintiffs have demonstrated "that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 350 (citing *Falcon*, 457 U.S. at 157-58).

Wexford argues that Plaintiffs cite inapposite cases. First, Wexford argues that Plaintiffs' reliance on *Armstrong v. Davis* is improper because the case predates *Wal-Mart*, which clarified the commonality requirement. 275 F.3d 849 (9th Cir. 2001). In that case, the Ninth Circuit affirmed in relevant part the certification of a class of individuals who had a wide range of disabilities— including hearing, vision, learning, and mobility impairments and developmental disabilities—that the defendant did not accommodate. *Id.* at 868. The Ninth Circuit held that "in a civil-rights suit . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Id.* Wexford does not explain why this holding is abrogated by *Wal-Mart*. *See* Def.'s Resp. at 21 ("The standards have changed, so pre-*Wal-Mart* caselaw no longer controls."). In *Wal-Mart*, the Supreme Court did not create a new test that made all prior caselaw irrelevant: It pointed to its 1982 decision in *Falcon* as "describ[ing] how the commonality issue must be approached." 564 U.S. at 352. The class in *Armstrong* did not suffer from the same problems as the class in *Wal-Mart*—notably in that the *Armstrong* class identified a top-down policy that "[did] not comply with the requirements of the ADA." 275 F.3d at 863. Regardless, the classes here are unlike the class in *Armstrong* because they involve individuals with the same condition (OUD) who seek access to the same type of treatment (MOUD).

Next, Wexford argues that Plaintiffs cannot rely on two other prison litigation cases: *Postawko v. Missouri Department of Corrections*, 910 F.3d 1030 (8th Cir. 2018) and *Rogers v. Sheriff of Cook County*, No. 1:15-CV-11632, 2020 WL 7027556 (N.D. Ill. Nov. 29, 2020). In *Postawko*, the Eighth Circuit affirmed certification of a class of incarcerated plaintiffs alleging that the Missouri Department of Corrections and various related defendants violated the Eighth

Amendment and the ADA by providing inadequate medical screening and care for chronic Hepatitis C (HCV) viral infections. 910 F.3d at 1033-34. In that case, the commonality requirement was satisfied by "the common question of whether the Defendants' policy or custom of withholding treatment with DAA drugs from individuals who have been or will be diagnosed with chronic HCV constitutes deliberate indifference to a serious medical need." *Id.* at 1038. The appellate court reasoned that "the physical symptoms eventually suffered by each class member may vary, but the question asked by each class member is susceptible to common resolution." *Id.* at 1038-39.

Wexford cites *Cody v. City of St. Louis* for the proposition that the Eighth Circuit has declined to extend *Postawko* beyond "precisely defined" classes. Def.'s Resp. at 22 n.8 (citing 103 F.4th 523, 532 (8th Cir. 2024)). Wexford suggests that the instant case does not involve such "precisely defined" classes. In *Cody*, the district court certified a class with a definition that did not even reference the challenged conditions of confinement. 103 F.4th at 532. *Postawko* alleged "precise policies or customs," which "is quite unlike Plaintiffs in [*Cody*], who, in their memorandum supporting their renewed motion to certify below, complained of undifferentiated 'putrid physical conditions,' which they argued remedied 'concerns of commonality and predominance' because they were limiting 'the class' allegation to only 'poor physical conditions.'" *Id.* The instant case is not similar to *Cody*.[5] Wexford's other arguments as to *Postawko* are not relevant given the new class definitions.

_____

[5] Wexford filed a Notice of Supplemental Authority pointing the Court to a decision denying motions for class certification in a case alleging inadequate medical care at West Virginia's Southern Regional Jail. *Rose v. PrimeCare Med., Inc.*, No. 5:22-cv-00405, 2025 WL 1417168 (S.D.W. Va. May 15, 2025) (Volk, J.). *Rose* was like *Cody*. The *Rose* plaintiffs proposed a class of "all current and former pretrial detainees and inmates" at the jail without narrowing the proposed class to individuals with a serious medical need. *Id.* at *8. The allegations were "remarkably general and troublingly sparse." *Id.* at *3. Plaintiffs "cite[d] multiple policy failures

In *Rogers*, a district court certified classes of pretrial and post-sentence detainees subject to the Cook County Jail's "taper-to-zero" methadone policy. *Rogers v. Sheriff of Cook Cnty.*, No. 1:15-CV-11632, 2020 WL 7027556, at *5 (N.D. Ill. Nov. 29, 2020), *modified*, No. 1:15-CV-11632, 2024 WL 1376134 (N.D. Ill. Mar. 30, 2024).[6] Again, some of Defendant's arguments are not relevant because the class definitions no longer include those with merely a positive drug test prior to incarceration. Wexford also argues that the *Rogers* classes included only those who were lawfully taking MOUD at the time they entered the jail, which meant that "[t]here was no need for the court to engage in individualized inquiries about whether members had a 'serious medical need' for which MOUD was an appropriate treatment." Def.'s Resp. at 23. But the parties do not seriously contest that MOUD is an appropriate treatment for individuals who were diagnosed with OUD, prescribed MOUD, or monitored for opioid withdrawal. To be sure, scenarios exist where providers will not and should not offer MOUD due to patient preference, potential interactions with other drugs in a patient's system, or some other medical reason. To account for this reality, the Damages Class definition includes those who were not "screened for MOUD induction" instead of those who were not "offered MOUD." This definition reflects Plaintiffs' assertion that Wexford "prohibits its employees from providing individualized medical care to the vast majority of its patients who suffer from OUD." Pls.' Reply at 5. Plaintiffs argue that every OUD patient

---

from [Wexford and other] Defendants, such as (1) failing to address chronic understaffing and overdue medical tasks, and (2) ensuring timely access to medical care." *Id.* at *10. The instant case is easily distinguishable from *Rose*.

      [6] In *Rogers*, the district court modified the class definition years after certification because the jail ended its mandatory policy and allowed "the ultimate decision to taper [to be] made on a case-by-case basis by the health care providers." 2024 WL 1376134 at *6. The revised class definitions excluded those who were incarcerated after the jail ended its mandatory policy. *Id.* Wexford argues that no class member should be included who entered a Wexford-staffed facility after 2022, when Wexford issued guidelines that permitted MOUD for non-pregnant patients. This argument fails because, unlike in *Rogers*, the Damages Class members were not subject to decisions "made on a case-by-case basis by the health care providers."

should get individualized medical care, not that every patient should get MOUD. The Court finds that the commonality prerequisite is satisfied.

### c. Typicality

Rule 23(a) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The threshold of meeting typicality is "not high." *Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009), *as amended* (Oct. 8, 2009) (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir. 1993)). "Typicality requires plaintiffs to show (1) that their interests are squarely aligned with the interests of the class members and (2) that their claims arise from the same events and are premised on the same legal theories as the claims of the class members." *Baxley*, 338 F.R.D. at 88 (cleaned up).

Defendant argues that Plaintiffs fail to demonstrate typicality because their constitutional claims depend "heavily upon proof of subjective elements, such as the Eighth Amendment's 'deliberate indifference' standard, which requires proof that medical providers knew a particular inmate was subjected to a 'substantial risk.'" Def.'s Resp. at 26. In some cases, subjective elements may require individualized showings that are "non-typical and unique to each" class member. *Broussard*, 155 F.3d at 342. Wexford cites a Fourth Circuit decision overturning class certification where franchisee plaintiffs alleged a franchisor made various misrepresentations. *Id.* at 340-42. "The representations made to each franchisee varied considerably." *Id.* at 342. In the instant case, Plaintiffs allege that Wexford knew of the risks to OUD patients denied MOUD. The subjective element does not vary considerably from class member to class member.

Wexford also argues that Plaintiffs' claims are typical at an "unacceptably general level." *Souter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 265 (4th Cir. 2012). However, Wexford argues that there are factual differences in the circumstances of various class members without

illuminating why those factual differences defeat typicality. A representative party's claim does not need to be identical to the claims of the class. *Id.* at 265. The important question is whether "the variation in claims strikes at the heart of the respective causes of actions." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). Here, there are factual differences between the claim of a woman in recovery who brought Suboxone with her to jail and was denied MOUD but received medicine to treat withdrawal symptoms, as well as her other prescription medications, and a man who was high on illicit opioids when booked into jail and experienced withdrawal with only multivitamins, ibuprofen, and other symptomatic medications instead of MOUD. Those factual differences do not strike at the heart of a deliberate indifference claim. The woman's interest in prosecuting her own case tends to advance the interests of the man's claim. Accordingly, the Court finds that the typicality requirement is satisfied despite these factual differences.

### d.   Fair and Adequate Representation of Class Interests

Finally, Rule 23(a)(4) precludes certification unless "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Two guidelines frame the Court's review of this requirement: (1) whether there is conflict between the representatives and class members and (2) whether the representatives will "vigorously prosecute the matter on behalf of the class." *Baxley*, 338 F.R.D. at 89. The second prong considers the abilities of both the class representatives and their attorneys. *Id.* As to this prerequisite, Wexford only argues that Plaintiffs cannot be adequate because they are not typical. Wexford again highlights factual differences in the circumstances of class members without illuminating the significance of those factual differences. Def.'s Resp. at 27-28.

The Court finds no evidence of conflict between the representatives and class members. Plaintiffs do not have any interests in conflict with the interests of class members they seek to

represent. Plaintiffs and their counsel have demonstrated their ability to prosecute this matter on behalf of the proposed classes. Adequacy of counsel is presumed absent proof to the contrary, *Baxley*, 338 F.R.D. at 90, and counsel have submitted declarations attesting to their experience in complex class actions and prisoner litigation, Pls.' Exs. 2-5. The law firms and practitioners of Tycko & Zavareei LLP, Forbes Law Offices, PLLC, Calwell Luce diTrapano PLLC, and Berger Montague have dedicated significant resources to investigating and prosecuting the claims in this action, as demonstrated by numerous discovery motions and this motion for class certification.

## V.    Satisfaction of Rule 23(b)

Even where the requirements of Rule 23(a) are met, plaintiffs must show that their action fits into one of three categories listed in Rule 23(b). *Gunnells*, 348 F.3d at 423.

### a.    Injunctive Relief Class

Plaintiffs move to certify the Injunctive Relief Class under Rule 23(b)(2). Certification under Rule 23(b)(2) is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the . . . remedy warranted." *EQT*, 764 F.3d at 357 (citing *Wal-Mart*, 564 U.S at 360). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

Plaintiffs propose that a single injunction requiring Wexford to screen those who have a diagnosis of OUD at the time of intake or during incarceration, test positive for opioids during incarceration, or are monitored for opioid withdrawal during incarceration and comply with the standard of care in providing MOUD treatment will bring relief to the class. Pls.' Mem. at 34; Pls.'

Reply at 26. Wexford responds that no single injunction can provide relief to each member of the class because Wexford cannot force a facility to offer MOUD. At this stage, it is not appropriate for the Court to decide whether Wexford's or Plaintiffs' account of Wexford's policymaking authority is the accurate one. For purposes of class certification, Plaintiffs have satisfied the requirements of Rule 23(b)(2).

### b. Damages Class

Plaintiffs move to certify the Damages Class under Rule 23(b)(3). Certification under Rule 23(b)(3) is appropriate when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts consider the following four factors: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." *Id.*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This inquiry focuses not only on whether common questions exist "but also on how those questions relate to the controversy at the heart of the litigation." *EQT*, 764 F.3d at 366.

Courts conduct a balancing exercise that is "qualitative, not quantitative," and recognizes that common issues "may still predominate even when some individualized inquiry is required." *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013). "For example, if 'common questions predominate regarding liability, then courts generally find the predominance

-33-

requirement to be satisfied even if individual damages issues remain.'" *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 214 (E.D. Va. 2015) (quoting *Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010)). Importantly, "[t]he entire notion of predominance implies that the plaintiffs' claims need not be identical." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019).

Here, Wexford points to several individualized issues that it argues will predominate: "Whether MOUD was medically appropriate in any given case, whether Wexford was authorized to provide MOUD in the facility where the member was housed, and whether any harm resulted from the lack of MOUD treatment all demand individualized inquiry." Def.'s Resp. at 13. Additionally, Wexford argues Plaintiffs challenge "the subjective reasonableness of an untold number of patient-specific treatment decisions," involving individual questions that predominate. Def.'s Resp. at 29. Again, Wexford emphasizes merits questions that are not appropriate to address at this stage. If at a later stage it becomes apparent that there is some small subset of cases where MOUD is not appropriate, then the Court can adjust the class definition accordingly. The redefined Damages Class includes those who the parties agree will very often benefit from MOUD: individuals with OUD, individuals already prescribed MOUD at the time of intake, and individuals being monitored for opioid withdrawal. Outliers do not overwhelm an otherwise cohesive class. The common question of whether Wexford's policy constitutes deliberate indifference predominates.

Wexford also raises arguments related to the need for individualized damages calculations. Plaintiffs' expert proposes "a common methodology that can be used to calculate economic damages based on estimated MOUD pharmaceutical and nursing costs that would have been incurred by Wexford had it implemented universal screening and induction for those who were

-34-

diagnosed with OUD and qualified for MOUD." Pls.' Mem. at 37 (citing Pls.' Ex. 13). Wexford argues that Plaintiffs' proposal "offers no viable path out of this thicket of patient-specific damages proof and harm determinations." Def.'s Resp. at 30.

The need for patient-specific damages determinations does not defeat certification of the Damages Class. "Rule 23 explicitly envisions class actions with such individualized damage determinations." *Gunnells*, 348 F.3d at 428. The Court need not identify the proper mechanism for setting damages at this stage. "If liability is found, then a damages-setting mechanism can be developed with input from the parties." *Rogers*, 2020 WL 7027556, at *7 (noting possible mechanisms based on withdrawal symptoms described in medical records or "damages amounts that are fixed according to a certain schedule, including the number of days that the class member suffered the symptom"). The parties retread the damages issues in the context of superiority.

Here, proving the relevant issues "in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues." *Gunnells*, 348 F.3d at 426. In their briefing, the parties did not discuss other litigation by class members in the context of superiority. The Court observes that in another case in this district, a single plaintiff sued Wexford after he was denied his prescribed Suboxone at West Virginia's Central Regional Jail. *Taylor v. Wexford Health Sources, Inc.*, 737 F. Supp. 3d 357, 365-67 (S.D.W. Va. 2024) (Berger, J.). The plaintiff testified that "he was too ill to get out of bed and did not know where he was at times during his withdrawal" and overdosed shortly after his release. *Id*. at 366. This case settled weeks before trial. *See* Notice of Settlement, *Taylor* (No. 2:23-cv-00475) (ECF No. 263). *Taylor* involved many similar issues, similar discovery, and testimony by at least one of the same individuals deposed for this case. The similarities between this case and *Taylor* demonstrate that

consolidation is likely to have benefits such as conserving judicial resources and reducing litigation costs.

Additionally, "class certification will provide access to the courts for those with claims that would be uneconomical if brought in an individual action." *Gunnells*, 348 F.3d at 426. Consolidation is especially economical for the class members who suffer pain for a matter of days or weeks during incarceration but do not overdose after release. *Cf. Taylor*, 737 F. Supp. 3d at 365-67 (describing plaintiff's account that he brought suit after he "nearly died"). The Court finds that a class action is superior to other methods to adjudicate this controversy.

## CONCLUSION

The Court **GRANTS** Plaintiffs' Motion for Class Certification, ECF No. 137, but redefines the proposed class definitions as follows:

> **Damages Class:** All individuals who were confined at a Listed Facility during the applicable Relevant Time Period, who (1) (a) had a diagnosis of Opioid Use Disorder (OUD) at the time of intake, and reported that diagnosis during intake, or were diagnosed during such incarceration, (b) had a prescription for FDA-approved Medication for Opioid Use Disorder (MOUD) at the time of intake, or (c) were monitored for opioid withdrawal during such incarceration; and (2) who were not continued on MOUD, if already prescribed MOUD, or screened for MOUD induction; and (3) who were thereafter released from the Listed Facility.[7]

_____

[7] The "Listed Facilities" along with their corresponding "Relevant Time Period" are as follows: Alabama Department of Corrections (7/7/2021 to 3/31/2023), Butler County Prison (7/7/2021 to 9/30/2021), Douglas County Jail (9/1/2024 to date of judgment), Erie County Prison (7/7/2021 to 12/31/2023), Illinois Department of Corrections (7/7/2021 to date of judgment), Mohave County Adult Detention Center (6/7/2022 to date of judgment), Navajo County Detention Center (3/8/22 to date of judgment), State of New Mexico Corrections Department (7/7/2020 to date of judgment), Nueces County Jail Facilities (12/1/2023 to date of judgment), Orleans Parish Jail (6/1/2024 to date of judgment), Pinal County facilities (7/7/2021 to date of judgment), St. Clair County Jail (7/7/2021 to date of judgment), St. Lucie County Jail (7/7/2019 to 3/31/2023), Southwest Virginia Regional Jails (7/7/2021 to date of judgment), West Virginia Division of Corrections & Rehabilitation Prisons and Jails (7/7/2021 to date of judgment), Western Virginia Regional Jail at Roanoke (7/1/2024 to date of judgment), Westmoreland County Prison (7/7/2021 to 8/30/2022), and Yavapai County Jail Facilities (7/7/2021 to date of judgment). Excluded from the Class is Defendant, and any entities in which Defendant has a controlling interest,

> **Injunctive Relief Class:** All persons who are currently, or will in the future, be confined at a carceral facility for which Wexford provides comprehensive medical and/or healthcare services, who have a diagnosis of Opioid Use Disorder (OUD) at the time of intake, and report that diagnosis during intake, or are diagnosed during such incarceration, test positive for opioids during such incarceration, or are monitored for opioid withdrawal during such incarceration.

Plaintiffs' claims are based on violations of the Eighth and Fourteenth Amendments to the Constitution for failing to provide adequate medical care. The law firms and practitioners of Tycko & Zavareei LLP, Forbes Law Offices, PLLC, Calwell Luce diTrapano PLLC, and Berger Montague are appointed class counsel.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        July 24, 2025

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

the Defendant's employees, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, as well as claims for personal injury or wrongful death. *See* Compl. ¶ 171.